**STATE of Minnesota, Respondent,**

v.

**James (NMN) RUSSELL, Jr., Appellant.**

**No. CX–92–772.**

Supreme Court of Minnesota.

July 16, 1993.

Lawrence W. Pry, Asst. State Public Defender, St. Paul, for appellant.

Lee W. Barry, Sr. Asst. County Atty., Michael O. Freeman, Hennepin County Atty., Minneapolis, Hubert H. Humphrey III, Atty. Gen., St. Paul, for respondent.

## OPINION

WAHL, Justice.

James Russell appeals from convictions of first degree felony murder in violation of Minn.Stat. § 609.185(3), and second degree intentional murder in violation of Minn.Stat. § 609.19(1), in connection with the death of Cornell Booker. He was tried by jury in Hennepin County District Court, convicted, and sentenced to life imprisonment. Defendant claims the evidence was insufficient as a matter of law to (1) prove that the homicide and its predicate felony, aggravated robbery, were part of a single, continuous transaction so as to sustain the conviction for first degree felony murder; and (2) sustain the conviction for second degree intentional murder. He also claims the trial court committed reversible error by refusing to suppress his confession. We affirm the convictions.

Defendant and his friend, Patricia Mitchell, Robert Prime and his friend, Tamii Stallworth, and Stallworth's two children all resided in the first floor unit of a duplex at 1219 Irving Avenue in north Minneapolis. The group faced eviction unless they paid $45 in back rent. They decided to get the rent money by robbing Cornell Booker, a 17–year–old neighborhood drug dealer, who they thought would be likely to carry a significant amount of cash on his person.

On the evening of June 13, 1991, Prime or Stallworth lured Booker into the duplex where Prime put a choke hold on Booker and wrestled him to the floor. Stallworth took Booker's cash, which amounted to a little over $100, while defendant obtained a phone cord and "hog-tied" Booker's feet and hands. After hog-tying Booker, defendant and Stallworth placed two gags, made of a dish rag and a pair of pantyhose, deep inside Booker's mouth and tied the gags behind Booker's neck. Defendant and Prime then carried Booker to a small room in the basement and placed him on his stomach.

Defendant and Prime then each took one end of a purse strap that was wrapped around Booker's neck and together pulled up on the purse strap. After two to three minutes, defendant released the strap and told Prime that he "couldn't do this," then left the basement and returned upstairs. Booker was alive at this time. According to defendant, Prime and Stallworth later returned to the basement and placed a two-by-four on Booker's neck. After Prime stomped on the two-by-four and hit Booker on the head with it, the two came upstairs and told defendant Booker was dead. Defendant helped divide and share in the proceeds of the robbery.

Police officers discovered Booker's decomposed body in the basement of the duplex on June 28, 1991, as a result of an anonymous 911 phone call. The call was made by Darrin Sanders who, after coming to stay at the duplex, had been told by defendant that "[Prime] has strangled a guy and put him in the basement." The police arrested no one but asked defendant, Prime, Sanders, and others to go to the police station to be interviewed, photographed, and fingerprinted. At the station, Sergeant Wagenknecht, who was in charge of the investigation, interviewed defendant without first giving him a *Miranda* warning. Defendant made no incriminating statements regarding Booker's murder. His statement was typed and given to him to review and sign.

While defendant reviewed his statement, Wagenknecht left the room and was stopped by Darrin Sanders, who identified himself as the person who made the 911 call. Sanders told Wagenknecht that defendant and Prime were involved in Booker's murder. Based upon this conversation, Wagenknecht arrested Prime, gave him a *Miranda* warning, and obtained a confession from him. Wagenknecht then

returned to defendant, told him he was under arrest for Booker's murder, and administered the *Miranda* warning. After defendant confessed to his involvement in the incident, Wagenknecht left the room and asked another officer assisting in the case, Sergeant Jackson, to go in and talk further with defendant. Wagenknecht told Jackson that he had given defendant a *Miranda* warning. Jackson entered the room and asked defendant whether he had been given a *Miranda* warning. Defendant stated that he had. Jackson talked with him about the murder, then left the room and briefed Wagenknecht on the statement defendant had given him. At this point, Wagenknecht gave defendant another *Miranda* warning as part of the formal statement and had the statement typed. Jackson and defendant went over the statement and both signed it. Before trial, defendant moved to suppress the statement as tainted fruit of the poisonous tree because Jackson did not administer a *Miranda* warning before talking with defendant about the murder. The motion was denied.

At trial, Dr. Kathryn Berg, who conducted the autopsy, testified that Booker died of asphyxia which could have been caused independently (1) by the presence of gags in his mouth which had become impenetrable to the passage of air because of his oral secretions; (2) by a broken hyoid bone in his neck which could have been caused by excess trauma such as strangulation; and (3) by being hog-tied and placed on his stomach so he could not move his chest to breathe.

A jury found defendant guilty of first degree felony murder in the connection with the aggravated robbery of Cornell Booker and of second degree intentional murder. This appeal followed.

Defendant first questions whether the evidence at trial was sufficient as a matter of law to sustain the first degree felony murder conviction. He argues that the state failed to prove beyond a reasonable doubt that the murder and its predicate felony, the aggravated robbery, were part of a single, continuous transaction.

The felony murder rule applies if the homicide occurred "while" the accused was committing or attempting to commit the felony. Minn.Stat. § 609.185(3) (1990). Under the *res gestae* theory, the felony murder rule is applied if the " 'felony and the killing * * * are parts of one continuous transaction.' " *Bellcourt v. State*, 390 N.W.2d 269, 274 (Minn.1986) (quoting *Kochevar v. State*. 281 N.W.2d 680, 686 (Minn.1979)). Even if the underlying felony is complete before the homicide occurs, felony murder may still be applicable. *Id.; State v. Murphy*, 380 N.W.2d 766, 771 n. 3 (Minn.1986). Hence, the felony murder rule encompasses a killing by one trying to escape or conceal a felony as long as there was no "break in the chain of events between the felony and the killing," *Murphy*, 380 N.W.2d at 771 n. 3, or as long as the "fatal wound" was inflicted during the "chain of events" so that the requisite time, distance, and causal relationship between the felony and killing are established. 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.5(f), at 223 n. 88 (1986). *See also State v. Lashley*, 664 P.2d 1358, 1368 (Kan.1983).

In this case, the robbery and the gagging, strangulation, and positioning of Booker on the basement floor were parts of a single, continuous transaction or chain of events because the activities occurred within a short period of time, at the same location, and as part of the act of robbing Booker. Even though Booker was alive after defendant quit pulling on the purse strap, the acts of gagging, strangling, and placing Booker on his stomach, all of which were completed before defendant quit pulling on the strap, could separately and independently have caused the asphyxia which resulted in Booker's death. Thus, the fatal wound was inflicted during the course of the robbery even though Booker may not have died until later. On the facts before us, it is not the actual time of death that determines whether the felony murder rule applies but, rather, when the fatal wound was inflicted. The evidence was sufficient to sustain the first degree felony murder conviction because it proved beyond a reasonable doubt that the murder and its pred-

icate felony, the aggravated robbery, were part of a single, continuous transaction.

Defendant next contends that the evidence was insufficient to sustain his conviction for second degree intentional murder because the state failed to prove (1) that defendant intended the victim's death; (2) that the death was a reasonably foreseeable consequence of the robbery; or (3) that defendant did not timely and effectively withdraw his participation in the crime.

■ Ample evidence exists to show that defendant intended Booker's death. To establish the criminal liability of an accomplice, the evidence must demonstrate that the accomplice intentionally aided, advised, hired, counseled or conspired with or otherwise procured the other to commit the crime. Minn.Stat. § 609.05, subd. 1 (1992). Presence, companionship, and conduct before and after an offense are circumstances from which a person's criminal intent may be inferred. *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981) (citing *State v. Parker,* 282 Minn. 343, 164 N.W.2d 633 (1969)). Inaction, knowledge, or passive acquiescence, however, do not rise to the level of conduct encompassed by Minn. Stat. § 609.05, subd. 1. *Id.* To impose liability under the statute, the state must show that the defendant encouraged the principal to "take a course of action which he might not otherwise have taken." *Id.* The state meets its burden, however, by showing " 'some knowing role in the commission of the crime' by a defendant who 'takes no steps to thwart its completion.' " *State v. Merrill,* 428 N.W.2d 361, 367 (Minn.1988) (quoting *State v. Jones,* 347 N.W.2d 796, 801 (Minn.1984)).

Defendant was not only present before, during, and after Booker's murder, he actively participated in the homicide by hogtying Booker, placing gags in his mouth, carrying him to the basement, and assisting in strangling Booker for two to three minutes. Defendant was "more than an innocent bystander" who only assisted "af-

ter the killing was completed." *Merrill,* 428 N.W.2d at 368. He "intentionally aided or promoted the crime which was committed." *State v. Gruber,* 264 N.W.2d 812, 819 (Minn.1978).

■ Ample evidence also exists to demonstrate that Booker's death was committed in furtherance of the aggravated robbery and that the murder was a reasonably foreseeable probable consequence of the robbery. *Merrill,* 428 N.W.2d at 367 (citing *State v. Filippi,* 335 N.W.2d 739, 742 (Minn.1983).[1] The record indicates that the murder was carried out to conceal the robbery because Booker was an alleged drug dealer who might later seek retaliation for the robbery. Whether defendant could reasonably foresee that Booker would be murdered is a question of fact for the jury. *State v. Filippi,* 335 N.W.2d 739, 742 (Minn.1983). In making its factual determination, the jury was "entitled to make reasonable inferences from the evidence, including inferences based on their experiences or common sense." *Id.* In and of itself, robbery is a crime against the person which is effectuated by the use or threatened use of force. Minn.Stat. §§ 609.24 and 609.245 (1992). Based upon the amount of force used during the aggravated robbery, Booker's death was reasonably foreseeable.

■ The evidence does not show that defendant withdrew from the commission of the homicide. In order to effectively withdraw, defendant was required not only to abandon the crime but also to make "a reasonable effort to prevent the commission of the crime prior to its commission." Minn.Stat. § 609.05, subd. 3 (1992). Even though defendant may have told Prime that he would not participate in any further attempt to kill their victim, defendant was required to do more. In *State v. Lucas,* 372 N.W.2d 731, 739 (Minn.1985), we said that the defense of withdrawal is without merit absent evidence that the defendant made an "effort to warn the police or the victim or prevent the other coconspirators from committing the crime." There is no

---

**1.** Minn.Stat. § 609.05, subd. 2 provides:
"A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably fore-

seeable by the person as a probable consequence of committing or attempting to commit the crime intended."

evidence here that defendant did more than simply quit pulling on the purse strap, tell Prime that he did not want to participate any further, and then leave the tied-up Booker at the mercy of Prime. Especially after having helped place Booker in a position of peril, defendant was required to take further affirmative action to effectively withdraw from the homicide.

Because defendant intended Booker's death, which was a reasonably foreseeable probable consequence in furtherance of the aggravated robbery, and because defendant did not effectively withdraw, the evidence was sufficient to sustain the conviction of second degree intentional murder.

Defendant lastly contends that the trial court erred in refusing to suppress his confession. Defendant claims that his statement to Wagenknecht was tainted fruit of the poisonous tree because Jackson did not give him a *Miranda* warning before taking his statement. This argument is without merit. The record shows that Sergeant Wagenknecht gave defendant one warning before he spoke to Sergeant Jackson and a second warning before his formal confession was taken. Both warnings were given after defendant was told he was under arrest for murder and before he made any incriminating statements. Defendant does not argue that his statement was not voluntarily, intelligently, or knowingly made. "[O]nce it has been established that the accused has been advised of his rights and has indicated that he understood and appreciated the rights, a statement resulting from subsequent interrogation is admissible absent other evidence to the contrary." *State v. Robinson*, 427 N.W.2d 217, 226 (Minn.1988). The trial court properly found defendant adequately warned and properly exercised its discretion in refusing to suppress defendant's statement.

We affirm defendant's convictions for first degree felony murder and second degree intentional murder.

Affirmed.