STATE of Minnesota, Respondent,

v.

Steven Wayne McBRIDE, Appellant.

No. C5–02–1346.

Supreme Court of Minnesota.

July 31, 2003.

Mark D. Nyvold, Special Assistant State Public Defender, St. Paul, MN, for Appellant.

Michael A. Hatch, Minnesota Attorney General, St. Paul, MN, James C. Backstrom, Dakota County Attorney, Nicole E. Nee, Assistant County Attorney, Hastings, MN, for Respondent.

## OPINION

BLATZ, Chief Justice.

Appellant Steven Wayne McBride was convicted in Dakota County of first-degree murder while committing criminal sexual conduct in the second degree for the death of Dillon Blocker. He was sentenced to life in prison without the possibility of parole. On appeal, McBride alleges that his conviction should be reversed because the district court erred when it admitted a notebook into evidence having concluded that (1) the second search warrant for his residence was supported by probable cause and (2) McBride lacked standing to object to the search. McBride further asserts that the evidence supporting his conviction was insufficient. We affirm.

Denise Patch met McBride in February 2001. One month later, they leased a two-bedroom apartment in Lakeville. Patch had two children from a prior relationship—a daughter, B.D.B., born on April 25, 1996, and a son, Dillon Blocker, born on September 26, 1997. When they met, Patch was working at B'Eagan With Us, a daycare center, and McBride was working at a Coca–Cola plant. Some time after they moved in together, McBride quit working.

Both Dillon and B.D.B. attended the daycare center where their mother worked, and Dillon took special speech classes through the Eagan school district. Beginning in May 2001, daycare personnel, Dillon's teacher, and the school nurse began questioning Patch about various bruises found on Dillon's buttocks, abdomen, and face. Patch told them that the bruises were from Dillon falling at daycare or while playing. One day in June, however, Patch came into the daycare center crying and told the employees that McBride was not allowed to pick up her children because he had spanked Dillon. Family members also noticed bruises on Dillon's body and saw McBride strike Dillon on several occasions. McBride's brother testified that he once witnessed McBride

strike Dillon in the chest when he was crying and, at another time, saw him grab Dillon by the face to get his attention. Patch's nephew testified that on their way to Valleyfair Amusement Park, he witnessed McBride hit Dillon numerous times on the head to keep Dillon awake.

Beginning in the middle of July 2001, Dillon and B.D.B.'s attendance at daycare became sporadic. Patch testified that she started keeping Dillon home at that time because he had bruises. At the end of August, Patch quit her job at the daycare and started working nights at Target. Patch was six months pregnant with McBride's child at the time. While she was working at Target, Patch would leave the children in McBride's care. On one occasion, upon returning home from work, she noticed new bruises on Dillon's back and shoulders. On another occasion, she found bite marks on his wrists. When questioned by Patch, McBride said that the bruises on Dillon's back and shoulders were caused when Dillon fell and rolled under B.D.B.'s bike and that the bite marks on his wrists were from Dillon having bitten himself. Because Dillon continued to have bruises and she was afraid that child protection would take him away, Patch kept Dillon home more in September, declined a home visit by his new speech teacher, and fabricated excuses for why Dillon could not attend his speech classes the first two weeks in September.

On September 17, the day before Dillon died, Patch testified that she did not notice anything different about Dillon. He ate breakfast, lunch, and dinner and his appetite appeared normal. He spent the day playing with his toys, taking a nap, and watching videos. Patch testified that Dillon still had bruises on his cheeks and bite marks on his wrists. In the afternoon, Patch watched Dillon urinate in the toilet and she did not notice any injuries to his genitals or abdomen. At some point during the day, Dillon showed Patch that he had little bumps on his tongue, which Patch characterized as "sores." In response, McBride gave Dillon some medication and put Orajel, an oral topical medicine, on his tongue. Before going to work that night at 9:30 p.m. and leaving the children in McBride's care, Patch got the children ready for bed. When Patch left for work, Dillon was wearing a sweatshirt with a picture of a soccer ball on the front.

Sometime between 2:15 and 2:45 a.m., Patch received a phone call from McBride. McBride told Patch that Dillon had fallen in the bathroom, had hit his head and penis, and was crying. McBride asked Patch to come home. When Patch got home, she saw that Dillon had another mark on his face across his cheek and eyes, a red mark on his penis, and a scrape on his forehead. Patch also told police that Dillon was wearing a different shirt than he was wearing when she left for work. When putting ice on Dillon's head and penis, Patch noticed that his ability to speak was "different" and that he seemed to be having trouble breathing. Concerned, Patch called poison control to see if the Orajel that had been put on Dillon's tongue earlier could affect him this way. After poison control assured her that it should not be a problem, Patch repeatedly asked McBride if they should take Dillon to the doctor because she was concerned about his breathing and thought he may have a concussion from the bump on his head. McBride responded that Dillon would be fine until morning. Patch and McBride then took Dillon into the master bedroom and propped him up on pillows. While McBride lay on the bed with Dillon, Patch read a cardiopulmonary resuscitation (CPR) manual. Patch testified that while holding the telephone in her hand, she again asked McBride if they should call 911 and McBride told her to put the

telephone down, that Dillon would be fine until the morning, and they could take him to the doctor then. Patch eventually fell asleep on the couch in the living room. When she woke in the morning, she went into the bedroom and found Dillon dead. Patch telephoned 911 while McBride carried Dillon to the living room. Patch tried CPR but it was to no avail.

At 7:01 a.m. on September 18, 2001, the Lakeville Police Department received the 911 call from Patch and two officers responded to the call. Upon entering the apartment, the officers saw Dillon lying on the living room loveseat and confirmed that he was dead. When asked what happened, McBride and Patch stated that sometime during the night a toilet seat had fallen on Dillon's penis which caused him to fall over and strike his head in the bathroom. Because of the visible physical trauma to Dillon and the implausibility of McBride and Patch's explanation, the officers decided an investigation was warranted.

Scientists from the Minnesota Bureau of Criminal Apprehension (BCA) were called to the apartment to do a crime scene investigation. They found blood on the walls and doors of the master bedroom and bathroom and on a number of items in the bathroom. They also found a cloth belt from a bathrobe, still damp with blood and saliva, hidden behind some containers in the closet. The BCA took blood samples to perform DNA analysis and determined that the samples matched Dillon's DNA. The BCA also performed DNA analysis on various samples of saliva and determined that the saliva on the cloth belt and Dillon's fingers matched Dillon's DNA. The saliva around Dillon's lips, mouth, and cheek area contained a mixture of Dillon and Patch's DNA which was consistent with Patch trying to perform CPR on Dillon. One of the BCA scientists also performed measurements on the toilet. Based on his measurements, the scientist testified that Dillon would have had to be "almost on his knees or squatted way down before his penis would have been in the position for the [toilet] seat to possibly come in contact with it."

Dr. Lindsey Thomas, a forensic pathologist and Dakota County coroner who performed the autopsy, estimated that Dillon died around 5:00 a.m. on September 18, 2001. The autopsy revealed that Dillon had older injuries—one to four days old—to his large bowel and to his mesentery, the connecting tissue that holds the small bowel in the abdomen. Thomas also found fibrinous peritonitis [1] in Dillon's abdominal cavity, leading Thomas to believe that Dillon's small bowel also had previously been ruptured and its contents had leaked into his abdominal cavity. In addition to these older injuries, Thomas found that Dillon had recent injuries to his liver, pancreas, mesentery, and large and small bowels. These new injuries caused more of the small bowel contents to spill into Dillon's abdominal cavity, adding to the infection that had previously developed. In addition to the injuries to his abdomen, Thomas found that Dillon had both recent and older injuries to his head that caused bleeding on the surface of the brain and swelling of the brain. In Thomas' view, blows of significant force were needed to cause both the old and new injuries. Thomas testified that in her opinion, even though Dillon may have eventually died from the older injuries to his abdomen, the recent injuries to his head and abdomen directly contributed to his death.

Dr. Janice Ophoven, a pediatric forensic pathologist, testified for the defense. In Ophoven's opinion, Dillon died from com-

---

**1.** Peritonitis is an infection of inflammation of the peritoneal cavity.

plications from the older injuries to his abdomen that had resulted in peritonitis. She further testified that his head injuries were both older and insufficient to have caused his death.

In rebuttal, the state called two expert witnesses, Dr. Judson Reaney and Dr. Mitchel Morey. Reaney, a pediatrician who specialized in child abuse and neglect cases, agreed with Thomas that the recent injuries to Dillon's abdomen contributed to Dillon's death and testified that, in his opinion, Dillon would not have died that night absent the new injuries. Morey, an assistant medical examiner certified in neuropathology, testified that the injuries to Dillon's head occurred anywhere from a day before to just before Dillon's death.

In addition to the injuries to Dillon's head and abdomen, Thomas found that Dillon had numerous rib fractures in various stages of healing, recent lacerations and scrapes on his face and neck,[2] and bruises and bite marks of various ages all over his body. One of Dillon's front teeth had been knocked out and was found in his stomach during the autopsy, and he had circular burns on his palms and wrist that were consistent with cigarette burns.

Finally, Thomas found injuries of varying ages on Dillon's penis and scrotum. Dillon's penis was swollen and the tip of the penis was very bruised. Thomas believed that the injury to the tip of the penis was "recent."[3] Dillon also had bruises and scrapes around his scrotum. At the base of the penis, Dillon had an older bruise that Thomas believed was three days to a week old. Thomas esti-

mated that the bruise on the right side of the scrotum was approximately 12 to 48 hours old and that the bruise on the left side of the scrotum was recent. Thomas further testified that the injuries to the tip of Dillon's penis and the base were consistent with bite marks.

Dr. Paul DeGallier, a forensic dentist, examined the bite marks on Dillon's body in an attempt to identify their source. As part of his analysis, DeGallier prepared molds of the teeth of McBride, Patch, B.D.B. and McBride's brother. DeGallier then selected and analyzed eight of the bite marks found on Dillon's body. DeGallier testified that to a reasonable degree of medical certainty, McBride was the source of the eight bite marks tested. DeGallier also testified that to a reasonable degree of medical certainty, McBride was the source of the bite marks at the base of Dillon's penis, on the left side of Dillon's scrotum, and on Dillon's tongue. As to the recent bite mark on the tip of Dillon's penis, DeGallier stated that he could not definitely say that the bite came from McBride.

In their investigation of Dillon's death, the police interviewed a number of Patch and McBride's neighbors, B.D.B., and two women McBride talked with on the telephone the night Dillon was injured. John Hofbauer and Sarah Anderson lived in the apartment directly above Patch and McBride's apartment. Hofbauer testified that on September 17 around 8:00 or 8:30 p.m., he heard loud noises that sounded as if something was striking the wall coming from Patch and McBride's apartment. Hofbauer also testified that sometime between 11:00 and 11:30 p.m. a telephone

---

**2.** Thomas testified that the scrape marks on Dillon's neck looked like the type of marks that "you get when someone has tied something around their neck and they're trying to get it off their neck." Dillon also had older scars on his neck that were consistent with fingernail scrapings that had healed.

**3.** Thomas defined a "recent" injury as one that occurred within the "one to twelve-hour time range, maybe eighteen hours."

rang downstairs for four or five minutes without being answered and that around 11:30, he thought he heard a shower running but he couldn't be sure where it was coming from.

Sarah Anderson testified that when she returned home from her night job around 1:30 a.m. on September 18, she saw McBride talking on the telephone through the apartment window. Anderson stated that she heard a telephone ringing constantly downstairs between 1:45 and 2:30 a.m. Shortly after Anderson went to bed around 2:30 a.m., she heard a car pull up and a downstairs door slam.

Lula Belle Cavanaugh, an upstairs neighbor, testified that she heard a little boy crying at about 2 a.m. on the morning of September 18, saying "it hurt" and then heard someone hollering at him to "shut up."

Melissa Dreir met McBride at a nightclub on September 14, the Friday night before Dillon's death, and gave McBride her number. On September 17, Dreir received a telephone call from McBride at 11:26 p.m. and they talked for seven minutes. Dreir stated that McBride seemed calm and normal on the phone and she did not hear any noise in the background.

Kari Donahue met McBride on the Qwest personal line[4] on September 16, and they exchanged numbers. On the evening of September 17, McBride telephoned Donahue "sometime in between 10:00 and 10:30ish," and they talked 30 to 45 minutes. McBride called Donahue back around 11:30 p.m. and they talked for approximately five or six minutes. During the first two conversations, Donahue did not hear any noise in the background. Donahue telephoned McBride back around

11:50 p.m. and they talked for approximately 10 minutes. At that time, Donahue could hear a boy crying. McBride told Donahue that the boy's name was Dillon, that the neighbors—who he claimed were Dillon's parents—were having a fight, and he was baby-sitting until things calmed down. Donahue testified that she could hear Dillon saying, "I'm tired" and McBride telling him to stand up and that he could not lay down. McBride then told Donahue that he was going to bring Dillon back to his "parents" because he was stupid and McBride could not take it anymore.

Investigator Forbord talked with B.D.B., Dillon's five-year-old sister, shortly before 9:00 the morning of September 18. B.D.B. told Forbord that after Patch left the night before, McBride put Dillon in a time out and made him stand in the corner by the door in the living room. Although B.D.B. was supposed to be asleep in her bedroom, she heard McBride spank Dillon with both a belt and his hand and that was "what got bruises all over him." B.D.B. also told Forbord that McBride would put them in the bathroom to check for bruises after spanking them and that when Patch came home, Patch and McBride argued about all the "owies" on Dillon. B.D.B. also heard Patch and McBride talking about how Dillon was acting like "he had no tongue in his mouth."

As part of the investigation of Dillon's death, the police obtained search warrants to search Patch and McBride's apartment. The first warrant, issued on September 18, allowed the police to search for any correspondence between McBride and Patch, but no correspondence was seized. Three days later, on September 21, police obtained a second search warrant to search

4. The Qwest personal line is a telephone line that operates like a chat line. People call into the personal line and record messages for other participants to listen to and possibly respond.

the apartment.[5] As issued, the second search warrant allowed the police to search for all items listed in the first search warrant plus clothes of McBride and first-aid manuals or books. The supporting affidavit attached to the application for the second warrant noted that the police had observed a first-aid manual in the living room during the first search and that Patch had told police that she was reading the manual the night of Dillon's death.

During the execution of the second search warrant, the police seized a notebook that contained two notes—one written by Patch to McBride and one written by Patch to herself. In the note to McBride, Patch wrote "[p]lease do not spink (sic) him or play rough them buns have to heal." At the bottom of the note, Patch noted that "P.S. He (sic) lips had Dry blood on them," and at the top, she wrote "I can't know if I'll make [it] through the Day." In the note written by Patch to herself, more on the order of a journal entry, Patch expressed her inability to "deal with [McBride] always leave (sic) marks on [Dillon]" and how Dillon "has to miss another hole (sic) week of school." She also wrote of her concern with McBride's inability to control his temper, noting "[h]e always tells me he'll stop putting his hands on him but it never happens." At the end, Patch wrote that she was scared to bring their baby into the world because if he treats Dillon "like that," he would do the same thing to the baby.

On October 22, 2001, a Dakota County grand jury indicted McBride on four separate counts for the death of Dillon: murder in the first degree (while committing child abuse); murder in the first degree (while committing criminal sexual conduct); murder in the second degree (intentional); and murder in the second degree (commission of a felony). McBride went to trial in April 2002, and the jury returned a guilty verdict on all counts except for intentional murder in the second degree. For the conviction of murder in the first degree while committing criminal sexual conduct in the second degree under Minn.Stat. § 609.185(2) (2002), also referred to as felony-murder, McBride was sentenced to life in prison without the possibility of parole. McBride asks that we reverse this conviction, asserting that the district court erred when it concluded that he did not have standing to challenge the seizure of the notebook and that the search warrants allowing the police to search the apartment for correspondence were not supported by probable cause. McBride also contends that there was insufficient evidence for the jury to find him guilty of the felony-murder conviction.

## I.

At trial, McBride moved to suppress the notebook seized during the execution of the second search warrant asserting that the provision that allowed police to search for correspondence between Patch and McBride was not supported by probable cause. The district court denied McBride's motion on two grounds. First, the court concluded that "[i]t is not uncommon that a primary caretaker would exchange information with the substitute caregiver about the children," and "[t]he police had probable cause to believe that correspondence would be located at the

---

**5.** The police obtained a total of 12 search warrants. The search warrant issued on September 18 allowing the police to search the apartment was search warrant number one and the warrant issued on September 21 which allowed the police to again search the apartment was search warrant number six. For ease of reference, they will be referred to as the first and second search warrant.

scene given the relationship of the parties." Second, the court concluded that McBride lacked "standing to argue for suppression of the written correspondence" because Patch, and not McBride, created the correspondence and the notebook was not found in "[McBride's] belongings" at the apartment. McBride contends that the court erred in admitting the notebook into evidence and asks us to conclude both that McBride had "standing" to challenge the seizure of the notebook and that the second search warrant was not supported by probable cause.

■ When reviewing a pretrial order denying a motion to suppress evidence, we may independently review the facts and determine whether the district court erred in not suppressing the evidence as a matter of law. *State v. Harris,* 590 N.W.2d 90, 98 (Minn.1999). When facts are not in dispute, standing is a question of law that we review de novo. *Joel v. Wellman,* 551 N.W.2d 729, 730 (Minn.App.1996), *review denied* (Minn. Oct. 29, 1996). When reviewing whether a search warrant is supported by probable cause, however, we afford great deference to the court's finding of probable cause and limit our review to ensuring that the court had a substantial basis for concluding that probable cause existed. *State v. Harris,* 589 N.W.2d 782, 787–88 (Minn.1999).

■ We begin by examining whether the district court erred in finding that McBride had no right to challenge the validity of the two search warrants that authorized the police to search the apartment where Patch and McBride resided. The court and McBride both describe the right to challenge the validity of a search warrant under the U.S. Constitution's Fourth Amendment as an issue of standing. However, the United States Supreme Court has stated that when determining whether a defendant has had his or her

Fourth Amendment rights violated, "the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (citing *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Thus, in determining whether a defendant can bring a claim asserting a violation of his .or her Fourth Amendment rights, the issue is "'whether the disputed search * * * has infringed an interest of the defendant which the Fourth Amendment was designed to protect.'" *State v. Carter,* 569 N.W.2d 169, 174 (Minn.1997) (quoting *Rakas,* 439 U.S. at 140, 99 S.Ct. 421), *overruled on other grounds by Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). Therefore, we begin by examining whether McBride had an interest, protected by the Fourth Amendment, that was violated by the search of Patch and his apartment.

■ "The Fourth Amendment protects against unreasonable searches and seizures, and its protections are not triggered unless an individual has a legitimate expectation of privacy in the invaded space." *State v. Perkins,* 588 N.W.2d 491, 492 (Minn.1999). Legitimate expectations of privacy are those expectations of privacy that "society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Fourth Amendment protections are personal rights that may not be asserted vicariously, *Rakas,* 439 U.S. at 133–34, 99 S.Ct. 421, and a defendant can seek the protections of the Fourth Amendment only if the defendant demonstrates that his Fourth Amendment rights, and not those of a third person, have been violated by the challenged search or seizure. *United States v. Padilla,* 508 U.S. 77, 81, 113 S.Ct.

1936, 123 L.Ed.2d 635 (1993). If an individual's expectation of privacy is violated, the evidence sought to be introduced against him or her may be suppressed. *Rakas,* 439 U.S. at 138, 99 S.Ct. 421.

■■ In determining whether McBride had a protected interest in the notebook, we must begin by examining whether he had a legitimate expectation of privacy *in the invaded space.* The parties have differing views as to what constitutes "invaded space." The state contends that McBride does not have a legitimate expectation of privacy *in the notebook* because the notebook belonged to Patch and he failed to show that he had mutual use of the notebook. McBride asserts that the Fourth Amendment violation in this case is not just the seizure of the notebook but also the entry into the apartment and the search that occurred. He further argues that he had a legitimate expectation of privacy *in the nightstand* where the notebook was found.[6]

We have not previously examined the issue of whether a defendant has a legitimate expectation of privacy in an item located in the defendant's residence when the item is owned by a third person. The Supreme Court and a number of other federal courts have addressed this issue, however. In *Alderman v. United States,* the prosecution attempted to introduce into evidence, against the homeowner, third-party conversations overheard on the homeowner's premises by an unauthorized surveillance. 394 U.S. 165, 176, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). In that case, the Court held that establishing an inter-

est in the premises searched was sufficient to assert a claim under the Fourth Amendment, stating that:

> If the police make an unwarranted search of a house and seize tangible property belonging to third parties * * * the homeowner may object to its use against him, not because he had any interest in the seized items as "effects" protected by the Fourth Amendment, but because they were the fruits of an unauthorized search of his house, which is itself expressly protected by the Fourth Amendment.

*Alderman,* 394 U.S. at 176–77, 89 S.Ct. 961. Building upon this analysis, the Court expanded its holding in a footnote, stating items seized pursuant to a *valid search warrant,* but belonging to third persons, can be used against a homeowner, thereby giving him a right to challenge the search and seizure of the third-party property.[7] *Id.* at 177, n. 10, 89 S.Ct. 961.

■■ In examining Minnesota's Constitution, we note that Article I, Section 10 contains language identical to the United States Constitution's Fourth Amendment protections against unreasonable searches and seizures. *State v. Carter,* 596 N.W.2d 654, 656 (Minn.1999). While we may interpret the Minnesota Constitution to provide more protection than the U.S. Constitution, it may not afford less. We conclude that McBride has a legitimate expectation of privacy in the apartment shared by Patch and McBride and therefore he has the right to challenge the search of the apartment and the use of the notebook against him.

---

6. The state does not challenge that McBride had a legitimate expectation of privacy in the apartment.

7. Other lower federal courts have likewise reached similar conclusions. *See United States v. Issacs,* 708 F.2d 1365, 1368 (9th Cir.1983) (determining resident could chal-

lenge a search of journals found in a safe even though defendant disclaimed ownership or awareness of journals at trial); *United States v. Perez,* 700 F.2d 1232, 1236 (8th Cir.1983) (concluding resident could challenge search of guest's luggage in his home).

Having concluded that McBride has a Fourth Amendment right to challenge the seizure of the notebook, we then turn to McBride's contention that the district court erred in finding that the search warrants were supported by probable cause. "A search warrant may be issued only upon a finding of probable cause by a neutral and detached magistrate." *Harris*, 589 N.W.2d at 787. In determining whether probable cause exists, the issuing judge

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 788 (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Among the factors for the issuing judge to consider "are the type of crime, the nature of the items sought, the extent of the suspect's opportunity for concealment, and the normal inferences as to where the suspect would normally keep the items." *Id.* (citing *State v. Pierce*, 358 N.W.2d 672, 673 (Minn.1984)).

Both the first and second search warrants allowed the police to search for "any correspondence" between McBride and Patch. McBride contends that the affidavits of both warrants did not provide any reason to believe such correspondence existed or that it would be relevant to the crime under investigation.[8] In response, the state contends that common sense and experience indicate that caregivers of small children who share responsibility for the children often write notes to each oth-

er. Such evidence, the state asserts, is relevant to determining the history of care provided to Dillon and may ultimately help determine the cause of Dillon's death, the cause of pre-existing injuries, and who had access to the child and the apartment.

Agreeing with the state, the district court concluded that it was not uncommon for caregivers to exchange information. Noting that the police stated in the affidavits for the search warrants the relationship between McBride and Patch and that McBride was a caregiver for the children, the court further concluded that it was reasonable to expect that Patch would share information with McBride.

We are persuaded by the district court's reasoning. Correspondence between Patch and McBride is especially relevant in a case such as this where the child was abused and had a number of old and new injuries. We, therefore, conclude that there was probable cause for allowing the police to search for correspondence between Patch and McBride in the first search warrant issued on September 18, 2001.

This conclusion, however, does not end our analysis, as the seizure of the notebook did not occur during the execution of the first search warrant but during execution of the second warrant three days later. McBride asserts that the second search warrant, which again authorized the police to search for correspondence, was not supported by probable cause because it did not state additional or new facts to authorize the police to re-search for correspondence between McBride and Patch. In support of his argument, McBride relies on *State v. Zanter*, 535 N.W.2d 624 (Minn. 1995).

---

8. McBride now challenges both search warrants for lack of probable cause, but in arguments to the district court he only challenged the second search warrant. Nevertheless, because both search warrants include identical provisions, we will address the issue for both.

In *Zanter,* the police sought and obtained three separate warrants to search the defendant's home over a period of 27 months. *Id.* at 628–29. The first search warrant authorized the police to search for and seize keys of the murder victim, but the second and third warrants did not. *Id.* During the third search of the defendant's home, the police seized a set of keys that belonged to the murder victim and were found in the bottom drawer of a dresser located in the basement. *Id.* at 629. Because the police did not provide new information with the third warrant application that would indicate that the previously listed items would now be discovered, we held that the issuing judge did not have a "substantial basis" for concluding that probable cause existed to search the home for the victim's keys. *Id.* at 634. In so holding, we stated that:

> Once the police have engaged in an exhaustive search of a particular place, they cannot expect to re-search that area at a later date without providing the issuing judge with new information sufficient to indicate that items sought, but not found, during prior searches will now be found. In such situations, the issuing judge must take particular care to separate the information that supported previous warrants from the new information that supports the current warrant application.

*Id.* at 633.

In this case, the additional facts provided in the supporting affidavit to the second search warrant were (1) the police and BCA executed the first search warrant on September 18, 2001 and several items of evidence were seized, (2) a first-aid manual was observed in the living room, (3) Patch had told investigators that she used the first-aid manual as a resource the night her son was injured, (4) the apartment had been secured as a crime scene since the execution of the first warrant, (5) the Dakota County Coroners Office performed an autopsy on Dillon on September 18, 2001, (6) the preliminary cause of death was multiple blunt force trauma to the abdomen and head, (7) McBride was charged with murder in the second degree, and (8) McBride was being held in jail on bond.

If we were to conclude that the inclusion of the correspondence provision in the second warrant was without probable cause, we still would not reverse a district court's decision if the error was found to be harmless beyond a reasonable doubt. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). A defendant who claims the court erred in admitting evidence has the burden of showing the error and any resulting prejudice. *State v. Lynch,* 590 N.W.2d 75, 80 (Minn.1999). In applying the harmless error test, the "appellate courts must look to the basis on which the jury rested its verdict and determine what effect the error had on the actual verdict. If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt." *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997) (citation omitted).

A review of the contents of the notebook indicates that it contained two notes written by Patch: one to McBride and one to herself. In the first note to McBride, Patch asked McBride to not spank Dillon or play rough with him because his "buns" needed to heal. The second note was from Patch to herself detailing how McBride left marks on the children when he disciplined them and how Dillon had to miss another week of school. She also stated that McBride had a bad temper that he could not control and that she was scared to bring their baby into the world because if he treated Dillon "like that," he was going to do the same thing to the baby.

While the contents of the notebook support the state's contention that McBride, and not Patch, inflicted the injuries on Dillon, a review of the remaining record indicates that there was ample other evidence that McBride inflicted the various injuries upon Dillon. For instance, the daycare and school personnel did not see bruises on Dillon until he began living with McBride. McBride's brother saw McBride strike Dillon in the chest when he was crying and Patch's nephew saw McBride hit Dillon numerous times on the head to keep him awake on the way to Valleyfair Amusement Park. B.D.B. told Investigator Forbord that McBride would discipline her and Dillon by spanking them with a belt and then would have them check to see if there were any bruises. B.D.B. also told Forbord that McBride put Dillon in a time out the night before his death, that she heard McBride spank Dillon with the belt and his hand, and that she heard her mother arguing with McBride when she came home about the "owies" on Dillon. Finally, both B.D.B. and Patch testified that McBride was home alone with Dillon and B.D.B. the night that Dillon was killed. Therefore, while not reaching the probable cause issue, we conclude that, even if we were to determine that the district court did err when it allowed the admission of the notebook, the error was harmless.

## II.

McBride next alleges that the evidence presented at trial was insufficient for the jury to have found him guilty of felony-murder under Minn.Stat. § 609.185(2). Minnesota Statutes § 609.185(2) provides that a person is guilty of murder in the first degree if the person "causes the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting

the person or another." McBride challenges the sufficiency of the evidence on two grounds. First, McBride contends that the state did not prove that he committed criminal sexual conduct. Second, McBride asserts that even if he did commit criminal sexual conduct, the state did not prove that the criminal sexual conduct occurred at the same time as the fatal injuries to Dillon's abdomen and head.

In reviewing a claim of insufficiency of the evidence, our scope of review is limited to ascertaining whether, based on the evidence presented at trial, a jury could have reasonably concluded that the accused is guilty of the offense. *State v. Vick*, 632 N.W.2d 676, 690 (Minn.2001). In doing so, we view the evidence in a light most favorable to the state and assume that the jury believed the state's witnesses and disbelieved the defendant's witnesses. *Id.* If, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty, we will uphold the jury's verdict. *State v. Johnson*, 568 N.W.2d 426, 435 (Minn.1997).

In reviewing a jury conviction based on circumstantial evidence in a criminal case, the circumstantial evidence is entitled to as much weight as any other type of evidence as long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational or reasonable hypothesis except that of guilt. *State v. Wallace*, 558 N.W.2d 469, 472 (Minn. 1997). We have recognized that even when the evidence is circumstantial, the jury is still in the best position to determine the credibility and weight of the evidence and therefore, when reviewing a guilty verdict, we assume that the jury believed the state's witnesses. *Id.*

■ We begin by examining whether the jury could have reasonably concluded that McBride committed the underlying felony, criminal sexual conduct in the second degree. As to this issue, McBride does not challenge that the bite marks found on Dillon's genital area constitute criminal sexual conduct[9] but instead, challenges the jury's conclusion that McBride was the source of those bite marks.

The primary evidence that McBride committed criminal sexual conduct against Dillon was Dr. DeGallier's testimony regarding the bite-mark comparisons he performed. At trial, DeGallier testified that to a reasonable degree of medical certainty, McBride was the source of the bite marks at the base of Dillon's penis, on the left side of Dillon's scrotum, and on Dillon's tongue. DeGallier further testified that, due to the size of the penis and the bite mark, he could not definitely say that the recent bite mark on the tip of Dillon's penis came from McBride.

■ While recognizing that credibility determinations are for the jury to make, McBride asks this court to disregard the testimony of DeGallier asserting that DeGallier's testimony is unreliable and not credible as a matter of law. McBride alleges that DeGallier upgraded his degree of certainty that McBride inflicted the bite marks on Dillon from "probable" or "possible" in his report and before the grand jury to "a reasonable degree of medical certainty" at the trial because he wanted to become board certified and needed to "testify in at least two trials." McBride further asserts that DeGallier was more likely to be used as an expert witness again if his opinion conveyed a higher degree of certainty.

At trial, DeGallier acknowledged that he did change the degree of certainty but that the reason he did so was because he continued to study, analyze, and understand the data after he wrote his report. Further, DeGallier was fully cross-examined at trial as to his desire to be board certified and as to his changing conclusions, thereby allowing the jury to reach its own conclusions on whether DeGallier's testimony was credible. Assuming as we must that the jury believed DeGallier's testimony, a jury could have reasonably concluded that McBride inflicted the bite marks on Dillon's genital area. We therefore hold that the jury's determination that McBride was guilty of committing the underlying felony, criminal sexual conduct in the second degree, is supported by sufficient evidence.

■ In his second challenge to the jury's conviction of felony-murder, McBride contends that the evidence is insufficient to prove that he killed Dillon while committing criminal sexual conduct because it is not possible to know when the act that caused Dillon's death occurred. In order to prove that McBride inflicted the fatal blows on Dillon while committing criminal sexual conduct, the state must prove that "the 'fatal wound' was inflicted during the same 'chain of events' [in which the underlying felony took place] so that the requisite time, distance, and causal relationship between the felony and killing are established." *State v. Russell,* 503 N.W.2d 110, 113 (Minn.1993) (citing 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law,* § 7.5(f) at 223

---

9. A person is guilty of committing criminal sexual conduct in the second degree if he or she engages in sexual contact with a complainant that is under 13 years of age and the actor is more than 36 months older than the complainant. Minn.Stat. § 609.343, subd. 1(a) (2002). Further, the definition of "sexual contact" includes "the intentional touching by the actor of the complainant's intimate parts * * *" with sexual or aggressive intent. Minn.Stat. § 609.341, subd. 11(a) (2002).

n. 88 (1986)). "So long as the underlying felony and the killing are part of one continuous transaction, it is irrelevant whether the felony took place before, after, or during the killing." *Harris*, 589 N.W.2d at 792.

In his argument, McBride emphasizes that he was alone with the children for five hours from approximately 9:30 p.m. until around 2:30 a.m. and that the experts testified that the recent injuries to Dillon's abdomen and head occurred within 12 hours of death. McBride asserts that because the state's evidence does not prove precisely when the criminal sexual conduct occurred or when the fatal blows were inflicted, a reasonable jury could not possibly conclude that McBride committed criminal sexual conduct either before or while inflicting the allegedly fatal blows to Dillon's abdomen and head.

While the jury may not have known from the testimony at trial precisely when the various injuries and the bite marks occurred, a jury may have, nevertheless, reasonably believed that the beating and the criminal sexual conduct occurred as part of "the same chain of events." In fact, the record as a whole would allow a jury to conclude that McBride tortured Dillon to death and that part of the torture included criminal sexual conduct in the second degree. We therefore hold that there is sufficient evidence for the jury to conclude that the criminal sexual conduct and the beating of Dillon occurred as part of "one continuous transaction."

Affirmed.