*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2146**

State of Minnesota,
Respondent,

vs.

Anthony London Foresta,
Appellant

**Filed January 19, 2016
Affirmed
Worke, Judge**

Hennepin County District Court
File No. 27-CR-13-25524

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Elizabeth R. Johnston, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Rachel F. Bond, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Worke, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**WORKE**, Judge

Appellant argues that the district court erred in denying his *Batson* challenge to respondent's peremptory strike of an African-American juror. Appellant also challenges

the sufficiency of the evidence supporting his conviction of aiding and abetting second-degree unintentional murder.  We affirm.

**FACTS**

K.F. shared an apartment with his stepfather, F.P.  During the early morning hours of March 4, 2013, screaming woke K.F. from his sleep.  K.F. grabbed his air rifle, entered the living room, and saw a man with a gun.  K.F. saw another man at the front door, but the man left the apartment.  F.P. and K.F. grabbed the gunman and wrestled him to the floor.  Shortly after, the gunman shot F.P. and fled the scene.  An ambulance transported F.P. to the hospital where he died shortly after.

At F.P's apartment, police located a discharged 9mm casing and a 9mm bullet lodged in the wall.  Law enforcement reviewed surveillance videos from F.P.'s apartment and determined that the suspects entered the building at approximately 4:11 a.m. and left at approximately 4:28 a.m.  The police eventually identified Cinque Turner and appellant Anthony London Foresta as possible suspects involved in F.P.'s death.  Foresta was charged with aiding and abetting: (1) second-degree intentional murder, (2) second-degree unintentional felony murder, and (3) attempted first-degree aggravated robbery.

Turner testified against Foresta in exchange for a reduced sentence.  Turner testified that on March 3, 2013, he was with a group of people at Rachel Rasmussen's house.  Turner heard Foresta questioning Rasmussen about where F.P. lived, how much money he had, and the amount of drugs he possessed.  On March 4, 2013, Turner drove Rasmussen to F.P.'s apartment to buy drugs.  After returning to Rasmussen's house, Foresta asked Turner to drive him to F.P.'s apartment.

2

Turner testified that he and Foresta entered F.P.'s apartment complex through the back door. Foresta handed Turner a semi-automatic pistol and put on a mask. Foresta suggested knocking on F.P.'s door and telling him that his apartment was leaking into the apartment below. When F.P. answered the door, Foresta pushed himself inside, and Turner followed. Turner raised the pistol and told everyone to get on the ground. Foresta rushed down a hallway inside the apartment and then rushed out of the apartment, closing the door behind him. Turner testified that F.P. and a young man jumped on him while he tried to conceal the pistol. F.P. and the young man refused to let go, so Turner fired a round that hit F.P. After shooting F.P., Turner left the apartment. Turner testified that it was Foresta's idea to rob F.P.

Rasmussen also agreed to testify against Foresta in exchange for a reduced sentence. Rasmussen testified that she propped open the back door to F.P.'s apartment complex when Turner dropped her off to buy heroin. Rasmussen previously told Foresta that F.P. sold drugs and stated how much money he had. After Rasmussen returned from F.P.'s apartment on the morning of March 4, 2013, Rasmussen and Foresta discussed returning to F.P.'s apartment. Rasmussen testified that Foresta and Turner talked about robbing F.P. Rasmussen had seen Foresta carrying a gun in the past and knew that Foresta had a gun while at her house.

Shortly after F.P.'s death, Foresta told Rasmussen that things "went bad" when he and Turner went to F.P.'s apartment. Foresta told Rasmussen that F.P. fought them, and Turner shot F.P. The jury found Foresta guilty of aiding and abetting second-degree

3

unintentional felony murder and attempted first-degree aggravated robbery. This appeal follows.

# D E C I S I O N

## *Batson challenge*

Foresta argues that the district court erred by denying his *Batson* challenge because the state's race-neutral reason for exercising a peremptory challenge was pretextual. A prosecutor typically may exercise peremptory challenges for any reason so long as it relates to his view on the outcome of the case, but "the Equal Protection Clause forbids . . . [striking] potential jurors solely on account of their race." *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986).

*Batson* established a three-step process for determining whether a peremptory challenge constitutes purposeful racial discrimination. *Id.* at 96–98, 106 S. Ct. at 1723–24. First, a defendant must establish a prima facie case of purposeful discrimination by showing that "a member of a protected racial group has been peremptorily excluded from the jury and . . . that circumstances of the case raise an inference that the exclusion was based on race." *State v. Blanche*, 696 N.W.2d 351, 364–65 (Minn. 2005). Second, if the defendant makes a prima facie case, the state must present a neutral explanation for challenging the juror. *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723. Third, the district court must determine if the defendant established purposeful discrimination. *Id.* at 98, 106 S. Ct. at 1724. The defendant carries the burden to persuade the district court of the existence of purposeful discrimination. *State v. Reiners*, 664 N.W.2d 826, 832 (Minn. 2003). "[T]he existence of racial discrimination in the use of a peremptory challenge is a

factual determination." *State v. Diggins*, 836 N.W.2d 349, 355 (Minn. 2013). This court gives "great deference to the district court's ruling and will uphold the ruling unless it is clearly erroneous." *Id.* (quotation omitted).

During voir dire, juror A.A., an African-American man, provided vague responses relating to his personal experience with violence and the criminal justice system. In response to the district court's inquiry about experience in the criminal justice system, A.A. stated that the mother of his child was recently prosecuted in an out-of-state domestic-violence case.

A.A. also stated that he had friends who were involved in the criminal justice system because of guns and drugs, including a "drug deal gone bad" and incidents involving injury or death. A.A. did not think that his experiences would impact his potential service as a juror. When asked whether he could separate his friends' experiences from the allegations against Foresta, A.A. responded that "some things will . . . trigger memories," but he could separate that from the allegations against Foresta. A.A. was also concerned about finding child care for one of his children and possibly missing work.

In response to Foresta's questioning, A.A. stated that he was not involved in the legal process when his friends were killed or hurt. A.A. agreed that he could decide the case based on the evidence presented but that his experiences with police were "more negative." A.A. agreed that he could remain unbiased but then stated:

> I don't bring in . . . any experiences, but . . . when you are
> emotionally attached to something, it[] automatically triggers,
> I'm going to be honest in saying, yes, I would still try to

distinguish the two, but, you know, when you have striking resemblances and . . . similarities, sometimes it looks and sounds like it does . . . .

While answering questions from the state, the following interaction took place:

> [THE STATE]: We don't want [personal experience] to overpower what actually happens in this courtroom or what you are actually presented with in this case. Does that make sense?
> A.A.: I do understand, but I also . . . know that they are my life experience, and like I said before, most of them have been negative, so . . . my life experience and . . . my jobs, and . . . today or during the course of this trial . . . I can understand I'm expected to do a certain job and I will . . . do that job to the best of my ability, but at the same time . . . I know certain things I hear would . . . trigger things.

When asked if it would be difficult to put personal experience aside, A.A. stated "I wouldn't say it would be difficult, I would say it would be a task."

The state exercised a peremptory challenge against A.A. Foresta, also an African-American man, objected and argued that the state struck A.A. because of race. The district court found that Foresta made a prima facie showing.

Next, the state provided two neutral reasons for striking A.A. First, the state stated that it struck A.A. because he had significant financial concerns about not working during trial. Second, the state stated that it struck A.A. because of his negative experiences with the criminal justice system and his hesitation as to whether he could put his personal experiences aside and focus on the facts of the case.

Finally, the district court found that Foresta did not prove purposeful discrimination because the state presented race-neutral reasons for striking A.A. that were not pretextual. "Appellate courts give considerable deference to the district court's

6

finding on the issue of the prosecutor's intent because the court's finding typically turns largely on credibility." *State v. Taylor*, 650 N.W.2d 190, 202 (Minn. 2002); *see State v. Martin*, 773 N.W.2d 89, 101 (Minn. 2009) ("We afford great deference because the record may not reflect all of the relevant circumstances that the [district] court may consider.") (quotation omitted).

Foresta argues that the state's race-neutral reasons are pretextual because A.A.'s past experiences and negative view of police are experiences shared by a large percentage of fair-minded African Americans. Foresta relies on *State v. McRae*, 494 N.W.2d 252, 257 (Minn. 1992). In *McRae*, the state peremptorily struck an African-American juror because of her feelings about "the system." 494 N.W.2d at 257. The supreme court reversed and remanded, concluding, "To allow the striking of this juror on the basis of those answers in effect would allow a prosecutor to strike any fair-minded, reasonable black person from the jury panel who expressed any doubt [that] 'the system' is perfect." *Id.* at 257, 260. But *McRae* is distinguishable in many ways.

First, in *McRae*, the state supported its challenge by stating that the juror thought the "system is unfair" and that the "jury process is a fraud." *Id.* at 257. But the supreme court characterized these statements by the prosecutor as "very troubling" and as an exaggeration, recognizing that the juror described "the system" as "generally fair" and never stated that "the system is unfair" or that the "jury process is a fraud." *Id.*

Second, the state struck the juror, in part, because it believed the juror would be lenient towards the defendant because they were both minorities. *Id.* The supreme court recognized that *Batson* forbids such reasoning. *Id.* Third, the state asked only the

7

African-American juror whether she thought the system was fair. *Id.* at 254. Fourth, the district court failed to complete all three steps of the *Batson* analysis. *Id.* at 258.

Here, the state did not allege that A.A. would be more lenient to Foresta because of race. The questions, aside from follow up questions, were asked of each potential juror. The record supports the state's reasons for striking A.A., and they are not "very troubling" or exaggerated. The state asserted that it struck A.A. because he had close friends involved in drug dealing, friends who were killed or hurt as a result of such activities, mostly negative experiences with police, and hesitation over whether he could set aside personal experiences. The record supports these assertions.

The district court also explained and went through each step of *Batson* with Foresta before making its decision. Thus, Foresta's reliance on *McRae* is unpersuasive. *See Martin*, 773 N.W.2d at 103–04 (rejecting *Batson* challenge and distinguishing *McRae*, in part, because the district court properly performed *Batson* analysis); *State v. McDonough*, 631 N.W.2d 373, 385–86 (Minn. 2001) (rejecting *Batson* challenge, in part, because the jurors were all asked the same questions).

The disproportionate exclusion of racial minorities from a jury may also factor into whether a peremptory challenge constitutes purposeful racial discrimination. *State v. Greenleaf*, 591 N.W.2d 488, 500 (Minn. 1999). But the presence of at least one minority on a jury may weigh against the assertion that a strike was racially motivated. *See State v. Everett*, 472 N.W.2d 864, 869 (Minn. 1991) ("[I]t is significant that the jury ultimately included a member of a minority."). In *Diggins*, the record did not clearly establish that the state's strike was racially motivated and the state accepted another juror who was

8

African-American. 836 N.W.2d at 357. Here, the venire and jury panel included at least one additional minority. Therefore, the district court did not err by denying Foresta's *Batson* challenge.

### *Sufficiency of the evidence*

Foresta argues that the evidence insufficiently supports his conviction for aiding and abetting second-degree unintentional felony murder. When reviewing an insufficient-evidence claim, we review the record to determine whether the evidence, when viewed in a light most favorable to the verdict, is sufficient to allow the fact-finder to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). We "assume that the jury believed the state's witnesses and disbelieved contrary evidence." *Dale v. State*, 535 N.W.2d 619, 623 (Minn. 1995). The verdict shall not be disturbed if the fact-finder, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn. 2004).

A person commits second-degree unintentional murder if he "causes the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a felony offense." Minn. Stat. § 609.19, subd. 2(1) (2012). "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1 (2012). A person is "also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the

person as a probable consequence of committing or attempting to commit the crime intended." *Id.*, subd. 2 (2012).

Foresta asserts that the evidence is insufficient because F.P.'s death was not caused "while" attempting to commit first-degree aggravated robbery. Foresta asserts that F.P.'s death did not occur during the commission of the robbery because Foresta left the apartment, and Turner was merely trying to escape.

Foresta's arguments are unpersuasive. "[W]here the underlying felony is completed before the homicide occurs, a conviction under the felony murder statute may still be proper." *State v. Arrendondo*, 531 N.W.2d 841, 844 (Minn. 1995).

> [T]he felony murder rule encompasses a killing by one trying to escape or conceal a felony as long as there was no break in the chain of events between the felony and the killing or as long as the fatal wound was inflicted during the chain of events so that the requisite time, distance, and causal relationship between the felony and killing are established.

*Id.* (citations and quotations omitted); *see State v. Russell*, 503 N.W.2d 110, 113 (Minn. 1993) ("Even if the underlying felony is complete before the homicide occurs, felony murder may still be applicable.").

Here, Foresta and Turner went to F.P.'s apartment to rob F.P. Foresta handed Turner a loaded pistol. Foresta and Turner entered F.P.'s apartment while Turner pointed the handgun at the occupants. Within minutes, F.P. and K.F. tackled Turner, and Turner shot F.P. as he tried to escape. Turner's behavior constitutes "a killing by one trying to escape . . . a felony" without a "break in the chain of events between the felony and the killing." *See Arrendondo*, 531 N.W.2d at 844 (quotation omitted). The possibility that

10

the attempted robbery ceased before the murder is not determinative. *See id.* at 843–45 (affirming felony murder conviction where defendant completed robbery before the victim was murdered).

Foresta also argues that the evidence is insufficient because the killing was not committed "in pursuance of" the aggravated robbery nor was it reasonably foreseeable. Foresta argues that he only knew Turner had a gun and that knowledge or possession of a gun is insufficient to make a killing reasonably foreseeable as a probable consequence of attempted aggravated robbery. Foresta's arguments are unpersuasive. First, someone who intentionally aids another in the commission of an offense "is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended." Minn. Stat. § 609.05, subd. 2. Foresta does not deny that he aided Turner in the attempted aggravated robbery.

Second, F.P.'s murder was "in pursuance" of the intended crime, attempted aggravated robbery. Here, F.P.'s murder facilitated Turner's escape, prevented F.P. from later potentially identifying Turner and Foresta, and prevented the possibility of retaliation. Thus, F.P.'s murder was in pursuance of the attempted aggravated robbery. *See State v. McAllister*, 862 N.W.2d 49, 56 (Minn. 2015) (concluding that a killing "furthered the commission of the robbery by facilitating the escape of the three men, preventing McMillan from later identifying his assailants, and preventing the possibility of retaliation."); *see also State v. Pierson*, 530 N.W.2d 784, 789 (Minn. 1995) ("[T]he record supports a finding that the murder was committed in furtherance of the robbery,

11

particularly because it shows that the first shot was fired just after [the victim] stated 'get off me' and resisted the robbery effort.").

Third, F.P.'s murder was a reasonably forseeable, probable consequence of attempted aggravated robbery. "Whether [Foresta] could reasonably foresee that [F.P.] would be murdered is a question of fact for the jury." *Russell*, 503 N.W.2d at 114. In making that decision, "the jury was entitled to make reasonable inferences from the evidence, including inferences based on their experiences or common sense." *Id.* (quotation omitted)

Robbery involves the use of force or the threatened use of imminent force. Minn. Stat. § 609.24 (2012). Here, Foresta planned to rob F.P., convinced Turner to drive to F.P.'s apartment, handed Turner a loaded pistol, and forcefully entered F.P.'s apartment. These facts could support the jury's conclusion that F.P.'s murder was reasonably foreseeable. *See State v. Jackson*, 726 N.W.2d 454, 460–61 (Minn. 2007) (holding that murder was reasonably foreseeable when the defendant attempted to rob a store with an assault rifle and a person he knew was "crazy enough" to do anything); *Pierson*, 530 N.W.2d at 789 (stating that "evidence indicating [that] the victim was murdered during the commission of an aggravated robbery is a significant factor [that] the jury may consider in determining foreseeability"). Therefore, the evidence sufficiently supports Foresta's conviction for aiding and abetting second-degree unintentional murder.

### Pro se arguments

In his pro se supplemental brief, Foresta seeks a new trial because: (1) the district court gave an erroneous jury instruction; (2) the evidence failed to exclude every rational

12

hypothesis except that of guilt; (3) his trial counsel provided ineffective assistance; and (4) the district court violated his right to a speedy trial. After careful review, we conclude that Foresta's claims are meritless and, therefore, he is not entitled to a new trial. *See State v. Davis*, 820 N.W.2d 525, 539 (Minn. 2012) (rejecting meritless pro se claims in summary fashion).

**Affirmed.**