**STATE of Minnesota, Petitioner, Appellant,**

v.

**Gordon Frederick FAKLER, Gregory George Fakler, Respondents.**

Nos. CX–92–1193, C8–92–1192.

Supreme Court of Minnesota.

Aug. 13, 1993.

Hubert H. Humphrey III, Atty. Gen., James B. Early, Sp. Asst. Atty. Gen., St. Paul, Julius E. Gernes, Winona County Atty., Winona, for appellant.

Mark A. Mercklewitz, Winona, for respondents.

COYNE, Justice.

We review here an unpublished decision of the court of appeals affirming a pretrial order suppressing evidence in the prosecution of Gordon and Gregory Fakler and dismissing the charges against the two men. This appeal presents two issues, both questions of first impression in this court: (1) What standard governs a magistrate's decision whether to authorize the installation and use of a pen register; and (2) Does the exclusionary rule apply to a violation of the statutory standard? We reverse and remand to the trial court.

During the investigation leading up to defendants' arrest, law enforcement officials obtained judicial orders pursuant to Minn.Stat. § 626A.36 which authorized the installation of pen registers on defendants' home telephone lines.[1] The applications for these orders included statements identifying the applicant as a licensed peace officer and special agent with the Minnesota Department of Public Safety, Gambling Enforcement Division, and certifications that the agency was conducting a criminal investigation of Gordon Frederick Fakler and Gregory George Fakler in connection with possible violations of Minn.Stat. §§ 609.75 and 609.76 (1990), sports bookmaking, and "that information likely to be obtained from the pen register is relevant

---

1. Minn.Stat. § 626A.39, subd. 3 (1990) defines a pen register as:

[A] device that records or decodes electronic or other impulses that identify the number dialed or otherwise transmitted on the telephone line to which the device is attached * * *.

Significantly, pen registers do not overhear oral communications and do not indicate whether calls are actually completed. *Smith v. U.S.*, 442 U.S. 735, 736 n. 1, 99 S.Ct. 2577, 2578 n. 1, 61 L.Ed.2d 220 (1978).

to an ongoing criminal investigation." The applications referred to the applicant's reliance on information received from two sources: the first source was a one-year old complaint received "via Winona County Sheriff Vern Spitzer stating that an individual known as Gordon Fakler was conducting illegal sports gambling activities in the Winona area." The second source was a complaint received by the applicant within the last 30 days from a "cooperating individual" who "stated that illegal sports wagers were being accepted over [defendants'] * * * telephone lines."

Pursuant to the orders authorizing the installation and use of a pen register, pen registers were placed on defendants' home telephone lines during October 1991, and between October 10, 1991 and October 22, 1991 a significant amount of telephone activity was recorded on the dates when major sporting events occurred. For example, on October 20, 1991, when the first game of the World Series and the regular Sunday schedule of NFL football games were being played, a total of 105 telephone calls were made to and from defendants' home telephones. The pen registers also recorded numerous calls to a Minneapolis telephone number, which the investigating agent suspected was "related to an illegal sports bookmaking operation being conducted in the Twin City metropolitan area" and several calls from defendants' home telephone lines to a business in Las Vegas that gave current "lines"[2] on sporting events. The pen registers recorded much less telephone activity on days when no major sporting events were scheduled; on October 15, 1991, when no major sporting events were scheduled, a combined total of only 13 incoming calls and 4 outgoing calls were recorded on the telephones of the two Faklers, Gordon and Gregory.

On October 24, 1991 special agent Thompson obtained search warrants for the Fakler residences. The affidavits in support of the applications for the warrants detailed the telephone activity record-ed by the pen registers and set out with some particularity the information which had prompted the applications for authorization to install the pen registers. Agent Thompson's affidavit disclosed that in September of 1990 Winona County Sheriff Vern Spitzer had relayed to Thompson the complaint of a Winona County private citizen that Winona resident Gordon Fakler was conducting illegal sports gambling activities. The complainant admitted that he had lost a large sum of money as a result of placing wagers on sports events with Gordon Fakler or his son, Gregory Fakler. The complainant alleged that when he was unable to pay his gambling debt, Gordon Fakler threatened him.

The affidavit in support of the warrant application went on to describe information received within the last 30 days from an independent confidential source who stated that Gordon Fakler, assisted by his son, Gregory, was conducting an illegal sports gambling/sports bookmaking operation and that the Faklers were accepting wagers over telephone lines which were identified by number. The confidential source also alleged that the Faklers were part of a large illegal sports bookmaking operation conducting business in the Twin City metropolitan area as well as in Winona. Agent Thompson requested that the identity of these two informants remain confidential to protect them from danger of great bodily harm.

The search warrant for the Gregory Fakler residence was executed on October 27, 1991, yielding $1,120 in cash, betting slips, line sheets for baseball and hockey games and slips of paper with bettors' balances written on them. During a 10–minute period while searching Gregory's residence, agent Thompson received nine bets from four telephone callers. The search of the Gordon Fakler residence yielded $900 in cash, keys for two safe deposit boxes, ripped up betting slips, two line sheets, and several Western Union money transfers.

---

**2.** A "line" is the point spread on a sports event; it serves to equalize the competing teams for the purpose of wagering. The point spread may change on receipt of information about the physical condition of players and the weather conditions in which the game will be played; and it may change as wagers are received so that the bookmakers can balance their books.

The evidence seized in these searches was then used to obtain warrants to search two safe deposit boxes.

On February 20, 1992 defendants were arrested and charged with sports bookmaking in violation of Minn.Stat. §§ 609.75, subd. 7 and 609.76, subd. 2 (1990). Defendants challenged the pen register orders at their joint omnibus hearing, arguing that the applications for the orders were insufficient to meet the standards imposed by Minn.Stat. § 626A.37 (1990). The district court held that the applications for the pen register orders did not meet the requirements of the statute as construed in *State v. Benson*, 484 N.W.2d 46 (Minn.App.1992), and suppressed the evidence recorded by the pen registers. The district court went on to hold that the applications for search warrants were defective absent the information yielded by the pen registers. Finally, the district court granted defendants' motions to dismiss all charges against them. The court of appeals affirmed.

The first question presented to this court by the state's appeal from the dismissal of the charges against defendants is whether the applications for the pen register orders were sufficient to comport with the requirements of Minn.Stat. § 626A.37. It should be emphasized at the outset of our discussion of this issue that the United States Supreme Court has ruled that there is no constitutional requirement for a court order or search warrant before a pen register may be used. *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

In 1986 Congress enacted the Electronics Communications Privacy Act, which sets procedural requirements for placing a pen register or trap and trace device on a telephone line without the subscriber's permission. The statute requires a court to authorize the use of such a device if the applicant certifies that the information "likely to be obtained" is "relevant to an ongoing criminal investigation." 18 U.S.C. §§ 3122(b) and 3123(a).

The Electronics Communications Privacy Act required enactment of a state pen register law within two years, and in 1988 Minnesota adopted a statute patterned directly on 18 U.S.C. § 3123. The following year, however, the legislature revised chapter 626A. Following the 1989 amendment, issuance of an order authorizing use of a pen register is no longer mandatory on presentation of an application containing a law enforcement officer's certification that use of the pen register is likely to provide information relevant to an ongoing criminal investigation. Now an application for an order authorizing installation of a pen register must include this information:

> (1) the identity of the law enforcement or investigative officer making the application, the identity of any other officer or employee authorizing or directing the application, and the identity of the law enforcement agency conducting the investigation; and

> (2) a statement of the facts and circumstances relied upon by the applicant to justify the applicant's belief that an order should be issued.

Minn.Stat. § 626A.36 (1990). Minn.Stat. § 626A.37, subd. 1 (1990) provides for the issuance of an order:

> Upon an application made under 626A.36, the court may enter an ex parte order authorizing the installation and use of a pen register * * * if the court finds on the basis of the information submitted by the applicant that there is a reason to believe that the information likely to be obtained by the installation and use is relevant to an ongoing criminal investigation.

At the Faklers' omnibus hearing the district court tested the sufficiency of the pen register applications by the court of appeals' interpretation of Minn.Stat. § 626A.37, subd. 1 (1990) set out in *State v. Benson*, 484 N.W.2d 46 (Minn.App.1992), which was issued long after installation of the pen registers on the Faklers' telephone lines. In *Benson* the court of appeals held that the applicant must "state facts or circumstances which give the court some articulable 'reason to believe'" that the installation and use of a pen register will

produce "probative incriminating evidence." *Id.* at 49.

Relying on its decision in *Benson,* the court of appeals concluded that in this case the trial court properly determined that the pen register orders violated the statute. The court of appeals also rejected the state's contention that suppression is not an appropriate remedy for the violation in this case, a contention based on the fact that the violation, if any, was statutory and not constitutional and on the fact that the agent acted in good faith.

■ While we agree with the court of appeals that the magistrate was not presented with sufficient information to justify the orders authorizing installation and use of the pen registers, we disagree with its analysis. The court of appeals took the position that an application for a pen register must establish " 'reason to believe' that incriminating evidence will be obtained." That is not what the statute says. The statute says "reason to believe that the information likely to be obtained by the installation and use [of the pen register] is relevant to an ongoing criminal investigation." Minn.Stat. § 626A.37, subd. 1. The state needs to show three things: (a) that there is "reason to believe" (b) that the information "likely" to be obtained (c) is "relevant to an ongoing investigation." Nothing in the statute or in common sense supports the idea that the "reason to believe" showing relates to the likelihood that "incriminating evidence" will be obtained. The showing relates to the likelihood that "relevant information" will be obtained.

■ It seems to us that the record of a telephone number dialed on a particular telephone line would only infrequently constitute evidence probative of criminal activity. Facts innocent enough by themselves, however, may well be relevant to an ongoing criminal investigation when they are evaluated in the context of other information. Indeed, collectively and in context, facts innocent when viewed in isolation may be relevant in establishing probable cause in the investigative stage[3] or in establishing guilt in the adjudicative phase.[4] Indeed, even though much information typically obtained by use of a pen register is not incriminating by itself and is superficially consistent with innocent behavior, nevertheless, it is at the same time relevant to an ongoing criminal investigation.

■ Our review of the record here discloses that agent Thompson was in possession of facts which justified his belief that orders authorizing use of pen registers should issue. Unfortunately, however, those facts do not appear in the pen register applications. Although the statements in the applications no doubt constituted a certification of agent Thompson's belief that a pen register was likely to provide information relevant to the ongoing criminal investigation and would, therefore, meet the requirements of 18 U.S.C. § 3123, they cannot be said to justify that belief or provide a basis other than reliance on the applicant's judgment for a reason to believe a pen register would provide information relevant to the investigation. Both applications referred to complaints from two unidentified confidential sources, each alleging that Gordon Fakler was conducting illegal sports gambling activities. One of the two sources alleged that Gordon Fakler and son, Gregory, were conducting their gambling activities over their home telephone lines. But there was no information regarding the credibility or history of these confidential sources or their connection with the Faklers and no other details of the alleged gambling.

The defendants contend that any defect in the application for an order authorizing the installation and use of a pen register requires suppression of the pen register evidence. As we pointed out in *State v. Mitjans,* 408 N.W.2d 824, 830 (Minn.1987), whether or not to suppress evidence ob-

---

3. *See, e.g., United States v. Sokolow,* 490 U.S. 1, 10, 109 S.Ct. 1581, 1586–87, 104 L.Ed.2d 1 (1989); *State v. Johnson,* 444 N.W.2d 824, 826 (Minn.1989); *State v. Combs,* 398 N.W.2d 563, 565–66 (Minn.1987).

4. *See* Minn.R.Evid. 401–403.

tained in violation of a statute or rule is "a quintessentially judicial issue." For example, violation of the procedure set out in Fed.R.Crim.P. 41 has not necessarily resulted in suppression of the evidence seized. In *State v. Lindsey*, 473 N.W.2d 857, 864 (Minn.1991), we held that the failure to record the application for a telephonic search warrant did not require suppression of evidence seized. The officer reasonably believed there was a need for prompt entry; he secured an assistant county attorney's permission to apply for a telephonic warrant; a substantially contemporaneous record made it clear that a search warrant would have issued had all the proper procedures been observed; and the defects were neither intentional nor deliberate. On the other hand, when the need for a telephonic warrant had not been demonstrated and when the procedures for obtaining a telephonic search warrant spelled out in *State v. Andries*, 297 N.W.2d 124 (Minn.1980) and *State v. Lindsey, supra*, were virtually ignored, the evidence seized pursuant to the defective warrant was suppressed. *State v. Cook*, 498 N.W.2d 17 (Minn.1993).

As we observed in *Cook*, 498 N.W.2d at 21, "If the purpose of suppression is to deter police officers from doing what they should not do, the officers should first have some guidance on what it is they should be doing." We have, of course, not previously had occasion to discuss the amended statutory application requirements for judicial authorization of the installation and use of a pen register. Moreover, although Minn. Stat. § 626A.11, subd. 1 (1990), specifically requires suppression of "[e]vidence obtained by any act of intercepting [5] wire, oral, or electronic communications, in violation of section 626A.02 [which sets out procedure for obtaining warrant authorizing wiretap] * * *", there is no statutory sanction applicable to pen registers. In view of the absence of any statutory sanction rendering the pen register evidence inadmissible and because it appears to us that a valid order would have issued had the application contained more of the information known to agent Thompson and that both the applicant and the judge, who did not have the benefit of our construction of the amended statutory requirements, thought the application complied with the statute, we hold that suppression of the pen register evidence on the ground that it had been illegally obtained was erroneous.

In *Lindsey*, we held that suppression was not required given the facts and circumstances of that case, but we added, "In a different case, of course, the result might be otherwise." 473 N.W.2d at 865. Subsequently, based on the different facts and circumstances present in *Cook*, we held that suppression was required. Under the facts and circumstances of this case, we hold that suppression of the information obtained from the use of the pen registers was not required, but we emphasize, as we did in *Lindsey*, that in a different case the result might be otherwise.

■ Since suppression of the information obtained from the use of the pen registers is not required, suppression of the fruits of the subsequent warranted search is not required even if the search may be said to be a fruit of the use of the pen registers. We note, however, that even if the exclusion of the pen register information were required, the subsequent search would be deemed a fruit of the pen register information only if the warrant could not have issued upon the basis of the other information in the search warrant affidavit. *State v. Hodges*, 287 N.W.2d 413 (Minn. 1979); 4 W. LaFave, *Search and Seizure*, § 11.4(f) (2d ed.1987).[6]

5. "Intercept" is defined at Minn.Stat. § 626A.01, subd. 5 (1991):

"Intercept" means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical or other device.

The United States Supreme Court has distinguished pen registers from listening devices, "for pen registers do not acquire the *contents* of

communications." *Smith v. Maryland*, 442 U.S. 735, 741, 99 S.Ct. 2577, 2581, 61 L.Ed.2d 220 (1979) (emphasis by the Court).

6. The state has not discussed the adequacy of the showing of probable cause in the warrant applications independent of the pen register evidence. Indeed, in response to a question at oral argument, counsel for the state gave it as his

In summary, we today make clear that the pen register statute means precisely what it says: a pen register may be authorized only if the magistrate finds "on the basis of the information submitted by the applicant" that there is "reason to believe that the information likely to be obtained * * * is relevant to an ongoing criminal investigation." While the facts and circumstances of this case do not require suppression of either the information obtained from the use of the pen registers or the evidence subsequently obtained as a result of the warranted searches, police officers and magistrates are hereby advised that in a different case and under different circumstances the result might well be otherwise.

Reversed and remanded for trial.

Respondents are jointly awarded $400 in attorney fees.

opinion that, absent the pen register evidence, he considered the showing of probable cause inadequate for issuance of the search warrants. Nevertheless, as Justice Kelley observed in *State v. Hannuksela,* 452 N.W.2d 668, 673, n. 7 (Minn. 1990),

> [I]t is the responsibility of appellate courts to decide cases in accordance with law, and that responsibility is not to be "diluted by coun-

sel's oversights, lack of research, failure to specify issues or to cite relevant authorities." Neither is the decision of this court to be controlled by counsel's choice of tactics. It is within our power to consider whether probable cause existed under the long established law of Minnesota. *See United States v. Leon,* 468 U.S. 897, 905, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984).