**STATE of Minnesota, Respondent,**

v.

**Reginald Lee GAIL, Appellant.**

**No. A05–329.**

Supreme Court of Minnesota.

May 18, 2006.

John Stuart, State Public Defender, Steven P. Russett, Assistant Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

GILDEA, Justice.

Reginald Lee Gail appeals from his conviction for the first-degree murder of Yvain Braziel while committing or attempting to commit the felony crime of unlawful sale of powder cocaine. We affirm.

On February 2, 2004, Braziel contacted Gail to arrange for the purchase of marijuana and powder cocaine. Braziel and his friend Andre Hollingsworth left Bemidji in a red, two-door Chevrolet Cavalier to meet Gail in the Twin Cities. Braziel and Gail spoke via cell phone during the trip, and the parties met at approximately 5:15 p.m. in north Minneapolis. Gail, wearing a black, down jacket, got into Braziel's car, told him what the price would be for the cocaine, and directed Braziel where to drive. The Cavalier pulled up behind a red, four-door Dodge Neon driven by De-Andre Hill. A passenger identified as Low was also in the Neon. After the two cars met, Gail got out of the Cavalier and talked with Hill and Low. Gail then went

back to the Cavalier, got in, and told Braziel to follow the Neon.

The Neon stopped at a yellow house, and Gail went to talk to one of the men in the Neon. Braziel and Hollingsworth circled the block and when they came back, the man Gail had spoken to was coming back from the house. Gail told Braziel to follow the Neon to another "stash" because they could not get into the yellow house. Gail got into the Neon and the two cars drove to an apartment building. Gail and one of the men from the Neon went into the apartment for about 10 minutes and after coming out, Gail told Braziel to follow the Neon to a side street "to make the transaction." Both cars drove near a park; Gail got out of the Neon and told Braziel to get into the Neon. Braziel resisted initially, but after both cars drove to a convenience store parking lot, Braziel got into the back seat of the Neon. The Neon then left the parking lot and Hollingsworth followed the Neon in the Cavalier.

The Neon stopped in the middle of the street a short distance from the corner of 39th and Emerson, with Hollingsworth stopping the Cavalier about "a car length and a half" behind the Neon. Gail got out of the Neon, left the front passenger door open, and stood between four and six feet from the passenger side of the car. Braziel then climbed from the back seat to the front, and began to exit the Neon while facing the rear of the vehicle. Hollingsworth saw a struggle and believed that someone in the car was pulling on Braziel's leg as he tried to exit the car. Hollingsworth saw Gail shoot at Braziel once while Braziel's leg was still in the car, and then Gail shot Braziel five or six more times. Braziel fell face down in the snow. Hollingsworth then saw the Neon "take off" and Gail leaving on foot.

A.L. also witnessed the shooting. She was shoveling snow one or two houses southeast of where the shooting occurred. A.L. saw the two vehicles in the street with an individual standing outside of each vehicle. A.L. saw the person near the Neon, who was wearing a dark, bulky coat, fire one shot, take a brief pause, and fire "four or five" additional shots. A.L. saw the shooter's "arm go rigid in a downward motion in front of him" and then saw "flashes from the gun." The shooter, standing on the passenger side of the car and partially blocked from A.L.'s vision by the hood of the car, was shooting downward "at something close by him." A.L. saw the shooter start to run and the Neon start to move southbound before she ran into her house to call 911 at 6:19 p.m.

When police arrived a few minutes later, Braziel had no pulse. The cause of Braziel's death was determined to be multiple gunshot wounds and the manner of death was homicide.

Police found Braziel's cell phone at the scene. The last call Braziel received was from a Verizon Wireless cell phone number. Police contacted Verizon on February 3 to request information about this phone number.[1] On February 3, Verizon provided the requested information, indicating that the phone number was listed to Erick Larkins, at an address in Minneapolis. Police went to this address and spoke to Byron Davis, who explained that he paid Larkins to use Larkins's name to lease cell phones. Davis told the police that he had "sublet" the Verizon phone that was used to call Braziel to a man he knew only as "Red or Reggie" and that Davis paid the bills attributed to that

---

1. The police indicated that they needed the information urgently and that an administrative subpoena issued under Minn.Stat. § 388.23 (2004) would be faxed in the next 24–48 hours. Police were unable to produce a signed copy of the subpoena.

phone. On February 10, Davis identified Gail as the "Reggie" to whom he had sublet the cell phone. Because of the "Caller ID" function on his phone, Davis knew that Gail had used the Verizon cell phone to call Davis several times on the day of the shooting.

Hollingsworth positively identified Gail as the shooter. Specifically, Hollingsworth made a photo identification of Gail on February 11, 2004, writing, "This is the shooter," on the back of the picture of Gail shown to him by an officer.

On February 12, 2004, Minneapolis Police Sergeant Gerhard Wehr was completing an application for a search warrant for Gail's apartment in Minneapolis when he learned that Gail had been apprehended at a Plymouth apartment. Wehr then completed an application for a warrant to search the Plymouth apartment. In the warrant application for the Plymouth apartment, in addition to providing information tying Gail to the murder and indicating that the Minneapolis apartment was Gail's residence, the application set forth the following information:

> On 2/12/2004 Sgt. King advised your affiant that Reginald Gail had been in contact with his probation officer on this day, and that Gail had called from phone number 763–[deleted]. Your affiant learned that this number list[s] to the [Plymouth Apartment]. Officers from the Minneapolis police went to this address. Officers knocked on the door and Reginald Gail came outside and was placed under arrest. Officers have since entered this apartment and have it secured.

A district court judge issued the warrant.

During the subsequent search of the Plymouth apartment, the police found a 9 mm Ruger semi-automatic handgun on top of a kitchen cabinet located above the refrigerator and a few feet from the entrance to the apartment. An expert testified that a bullet retrieved from Braziel's body was, "to a reasonable degree of scientific certainty," fired from the Ruger handgun.

Gail was indicted on three counts of felony murder: count 1—intentional murder while committing or attempting to commit the crime of aggravated robbery; count 2—intentional murder while committing or attempting to commit the crime of unlawful sale of a controlled substance; and count 3—intentional murder while committing or attempting to commit the crime of kidnapping. The trial began on Monday, November 15, 2004, and the case was submitted to the jury at 2:30 p.m. on Friday, November 19, 2004. On Saturday, November 20, 2004, the jury found Gail guilty on the second count of the charged crimes (intentional murder while committing or attempting to commit the crime of unlawful sale of a controlled substance).[2] The district court sentenced Gail to life in prison.

Gail raises the following seven issues in this direct appeal:

1. Was the search warrant issued for the search of the Plymouth apartment supported by probable cause?

2. Should the cell phone records provided by Verizon have been suppressed?

3. Did the district court err in denying Gail's motions to empanel a different jury venire because of underrepresentation of African–Americans or in denying Gail's motion for additional discovery relating to the selection process for petit jury pools?

---

**2.** The jury acquitted Gail of the first count of the indictment, intentional murder while committing or attempting to commit the crime of aggravated robbery. The district court dismissed the third count, intentional murder while committing or attempting to commit the crime of kidnapping, prior to submitting the case to the jury.

4. Was the evidence sufficient to support Gail's conviction of first-degree felony murder?

5. Did the district court commit reversible error by failing, sua sponte, to allow the jury to decide whether a witness was an accomplice for purposes of giving an accomplice corroboration instruction?

6. Did the district court err in ordering that the jury be sequestered or in ordering that the jury begin deliberations on a Friday afternoon?

7. Did the State commit prosecutorial misconduct in closing argument?

## I.

■■■ Gail argues that the search warrant issued for the Plymouth apartment violated the United States and Minnesota Constitutions because it was not supported by probable cause.[3] *See* U.S. Const. amend. IV; Minn. Const. art. I, § 10. "When examining whether a search was supported by probable cause, the ultimate question is whether there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Carter*, 697 N.W.2d 199, 204 (Minn.2005) (*Carter III*) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). We "look only to information presented in the affidavit" in making this determination. *Carter III*, 697 N.W.2d at 205. The application for the search warrant, "interpreted in a common-sense and realistic manner," must be found to "contain information which would warrant a person of reasonable caution to believe that the articles sought are located at the place to be searched." *Rosillo v. State*, 278 N.W.2d 747, 748–49 (Minn.1979); *see also State v. Rochefort*, 631 N.W.2d 802, 804 (Minn.2001) ("An appellate court reviews a district court's decision to issue a warrant only to consider whether the issuing judge had a substantial basis for concluding that probable cause existed.").

■■■ In addition, "[w]e afford great deference to the issuing judge's determination on probable cause." *State v. Jones*, 678 N.W.2d 1, 11 (Minn.2004). We do not want "the warrant requirement [to] become so burdensome as to discourage the police from seeking review by" a judge. *State v. Harris*, 589 N.W.2d 782, 791 (Minn.1999). Accordingly, " 'the resolution of doubtful or marginal cases * * * should be largely determined by the preference to be accorded to warrants.' " *Massachusetts v. Upton*, 466 U.S. 727, 734, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (quoting *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)).

■■■ Assessing the warrant issued to search the Plymouth apartment under the standards outlined above, we conclude that there was probable cause to issue the search warrant. As Gail notes, most of the application for the search warrant establishes the probable cause to arrest Gail and search his Minneapolis apartment, and only one paragraph is devoted specifically to the Plymouth apartment. That paragraph however contains the most impor-

---

**3.** As discussed in part II, *infra,* the Supreme Court has made it clear that Gail can only challenge the search warrant if the "disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *see State v. McBride*, 666 N.W.2d 351, 360 (Minn.2003) (same). Gail "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas*, 439 U.S. at 131 n. 1, 99 S.Ct. 421. Because both parties appear to assume on appeal that Gail has met his burden, we also assume, without deciding, that Gail "has a right under the Fourth Amendment to challenge" the search warrant. *In re Welfare of B.R.K.*, 658 N.W.2d 565, 571 (Minn.2003).

tant facts establishing a connection between the Plymouth apartment and the murder—the fact that the prime suspect in the murder (Gail) came out of the apartment immediately before he was arrested earlier that day and that the apartment had been "secured" since the time of the arrest.

The application states that Gail had been "positively identified" by an eyewitness "as the shooter." The application also establishes that Gail had a connection to the Plymouth apartment; he did not simply happen upon it or briefly pass through the apartment. Rather, the application establishes that Gail had enough of a connection with the Plymouth apartment to contact his probation officer using the telephone in this residence. According to the application, Gail remained at the apartment long enough for the probation officer to call the police, for the police to locate the address of the apartment, and for the police to travel to the apartment and find Gail there. The murder weapon had not been located and the application establishes that the Plymouth apartment was the last place available to Gail to hide evidence of the crime for which he had been identified as the perpetrator. Because of Gail's connection to this apartment and his arrest there just 10 days after the murder, we conclude it was reasonable to infer that the murder weapon might be found there. *See State v. Thompson,* 578 N.W.2d 734, 737–39 (Minn. 1998) (weapon connected with murder found at perpetrator's acquaintance's house where perpetrator was arrested); *State v. Riley,* 568 N.W.2d 518, 521–22 (Minn.1997) (same).

In sum, the application, interpreted in a common-sense and realistic manner, contained information which would lead a person of reasonable caution to believe that the gun might have been left behind in the Plymouth apartment. *See Rosillo,* 278 N.W.2d at 748–49. The "great deference" that this court affords to an issuing judge's determination of probable cause, and the preference that we accord to warrants, support our conclusion that there was probable cause to issue the search warrant for the Plymouth apartment. *See Jones,* 678 N.W.2d at 11; *Harris,* 589 N.W.2d at 791. We hold that Gail's constitutional rights were not violated because the warrant to search the Plymouth apartment was supported by probable cause.

## II.

Gail argues that his rights under the Minnesota Constitution were violated when the police obtained cell phone records from Verizon Wireless. When we examine "whether a defendant can bring a claim asserting a violation of his or her Fourth Amendment rights, the issue is 'whether the disputed search * * * has infringed an interest of the defendant which the Fourth Amendment was designed to protect.'" *State v. McBride,* 666 N.W.2d 351, 360 (Minn.2003) (quoting *State v. Carter,* 569 N.W.2d 169, 174 (Minn.1997) (*Carter I*), *rev'd on other grounds,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)). Gail "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In 1999, we held "that appellants' rights to challenge any search under Article I, Section 10 of the Minnesota Constitution are coextensive with appellants' rights under the Fourth Amendment to the United States Constitution." *State v. Carter,* 596 N.W.2d 654, 656 (Minn.1999) (*Carter II*). We therefore conclude that just as Gail would have the burden of establishing that he has a protectible right under the United States Constitution, he likewise has the burden of establishing that his rights under Article I, Section 10 of the Minnesota Constitution

were violated when the state obtained cell phone records from Verizon Wireless.[4]

██ The protections of the Minnesota Constitution are not triggered unless Gail has a legitimate expectation of privacy in the cell phone records. *See McBride,* 666 N.W.2d at 360. "Legitimate expectations of privacy are those expectations of privacy that 'society is prepared to recognize as "reasonable." ' " *Id.* (quoting *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). We use a two-step analysis to determine whether those protections are triggered. *In re Welfare of B.R.K.,* 658 N.W.2d at 571. The first step is to determine whether Gail "exhibited an actual subjective expectation of privacy in the" cell phone records. *Id.* The second step is to determine whether that expectation is reasonable. *Id.*

██ In conducting the first step in the analysis, "courts should focus their inquiry on the individual's conduct and whether the individual '[sought] to preserve [something] as private.' " *Id.* at 571 (quoting *Bond v. United States,* 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000)). We have found that a defendant illustrates a subjective expectation of privacy when he attempts to conceal activity or items. *See id.* at 572. In this case, Gail produced no evidence that he attempted to conceal anything about the cell phone he used. The evidence in the record supports the opposite conclusion.

Most importantly, Gail was a stranger to Verizon, the holder of the records at issue here. Accordingly, we do not have before us, and we specifically decline to reach, the question of whether a more typical user of a cell phone (i.e. the person who has the direct relationship with the cell phone company) has an expectation of privacy in her cell phone records. In this case, Gail was three steps removed from Verizon and the records it produced via the company's "lease" to Larkins, Larkins's "sub-lease" to Davis, and Davis's "sub-sub-lease" to Gail. Moreover, Davis, not Gail, received the bills for the usage of the cell phone from Verizon, and Davis, not Gail, paid these bills. Because two other people stood between Gail and Verizon, and Gail did not testify or call any witnesses to support a finding that he had an expectation of privacy in the records, we cannot conclude on this record that Gail subjectively expected Verizon to keep records of his cell phone usage private.

Not only can we not conclude that Gail expected Verizon to keep this information confidential, but we cannot conclude that Gail did anything himself to keep his cell phone usage confidential. For example, Gail made numerous calls to Braziel from the cell phone. When the police obtained Braziel's cell phone, they were able to determine that the number ultimately attributed to Gail was the last number to call Braziel's phone via the "Caller ID" function on that phone. When Gail contacted Davis on the day of the shooting, Davis knew that the Verizon cell phone was used to make the calls because Davis also had "Caller ID."

Gail had the burden of proving that he had a subjective expectation of privacy. He produced no evidence to support the notion that he was trying to keep his use of the cell phone he "sub-leased" from Davis private. Based upon this record, we find that Gail has not met his burden of showing he had a subjective expectation of privacy in the cell phone records obtained from Verizon.[5] Accordingly, the district

---

4. Gail does not claim that the use of the cell phone records violated his rights under the U.S. Constitution.

5. Because we conclude that Gail failed to demonstrate that he had a subjective expectation of privacy in the cell phone records, we do not reach the second issue, whether such

court did not err in refusing to suppress the cell phone records.

Our conclusion that Gail failed to demonstrate that he had a subjective expectation of privacy in the cell phone records is also dispositive of his alternative argument based upon Minn.Stat. § 388.23 (2004).[6] Gail contends that the cell phone records should have been suppressed because this statute was violated. Specifically, Gail claims that the statute was violated because the police were not able to produce a subpoena signed by the County Attorney's Office. Gail relies upon *State v. Cook*, 498 N.W.2d 17, 20 (Minn.1993) (telephone warrant), and *State v. Frink*, 296 Minn. 57, 74–75, 206 N.W.2d 664, 674 (1973) (wiretap), for the proposition that suppression of evidence is the appropriate remedy when statutory or rule requirements for the collection of that evidence have not been satisfied. For purposes of this case, we will assume that suppression is an available remedy for violation of Minn.Stat. § 388.23.[7] In this case, Gail cannot avail himself of that remedy because, as set forth above, he is a complete stranger to Verizon with regard to the cell phone rec-

ords. Accordingly, we hold that the district court did not err in failing to suppress the cell phone records on the basis of the statute's alleged violation.

### III.

Gail argues that the district court erred when it denied his motion to empanel a different jury venire because of underrepresentation of African–Americans, and his alternative motion to discover information relating to the selection process for petit jury pools. Gail did not file a written challenge to the jury panel as required by Minn. R.Crim. P. 26.02, subd. 3.[8] Instead, Gail's counsel orally objected to the jury venire after it was brought into the courtroom. Gail argued that a new venire should be brought up because only one person self-identified as African–American on the 50–person venire. In the alternative, Gail asked the district court to order the jury office to provide information about the selection of the jury pool. The court denied the requests, "find[ing] no evidence of material departure from the

---

an expectation would be one that " 'society is prepared to recognize as "reasonable." ' " *McBride*, 666 N.W.2d at 360 (quoting *Katz*, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring)).

**6.** This statute provides that the county attorney "has the authority to subpoena and require the production of any records of telephone companies, cellular phone companies * * * for records that are relevant to an ongoing legitimate law enforcement investigation."

**7.** This assumption should not be read as indicating one way or the other how we will view this issue in a different case. *See, e.g., State v. Fakler*, 503 N.W.2d 783, 787–88 (Minn. 1993) (holding that pen register evidence was admissible even though the evidence was obtained without complying with statute authorizing installation of pen register). Gail's argument that suppression is an appropriate remedy is premised upon his assertion that

the legislature enacted Minn.Stat. § 388.23 to protect individuals' privacy. Language in the statute, however, seems contrary to this assertion. *See* Minn.Stat. § 388.23, subd. 1 ("This provision applies only to the records of business entities and does not extend to private individuals or their dwellings."). In any event, we leave this issue for another day.

**8.** Minn. R.Crim. P. 26.02, subd. 3, reads:

Either party may challenge the jury panel on the ground that there has been a material departure from the requirements of law governing the selection, drawing or summoning of the jurors. The challenge shall be in writing, specifying the facts constituting the grounds of the challenge, and shall be made before a jury is sworn. If the opposing party objects to either the sufficiency of the challenge or the facts on which it is based, the court shall hear and determine the challenge.

requirements of law that govern the selection process here in Hennepin County."

After five jurors had been selected and Gail had struck the only African–American venire person for cause, he renewed his request that the court order a new venire. Gail moved to restart the jury selection process, hoping that a new venire would be more representative. The district court denied this request by stating: "There is nothing in what I have heard up here * * * that calls into question, to me, the actual procedures."

■■■■ Sixth and Fourteenth Amendment challenges to the makeup of jury pools are questions of law that this court reviews de novo. *See State v. Roan*, 532 N.W.2d 563, 569 (Minn.1995) (Sixth Amendment challenges); *State v. Willis*, 559 N.W.2d 693, 700–01 (Minn.1997) (Fourteenth Amendment Equal Protection challenges). In order to "establish a prima facie showing" that his Sixth Amendment right to a representative jury venire have been violated, a defendant must show "that over a significant period of time— panel after panel, month after month—the group of eligible jurors in question has been significantly underrepresented on the panels and that this results from 'systematic exclusion.'" *State v. Williams*, 525 N.W.2d 538, 542–43 (Minn.1994). A challenge to the jury venire under the Fourteenth Amendment likewise requires that the defendant show underrepresentation "over a significant period of time." *See Castaneda v. Partida*, 430 U.S. 482, 494–95, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

■■■■ Gail has provided no evidence to satisfy the *Williams* standard. To the contrary, Gail's attorney told the district court: "I can tell you that it seems like we've had more African Americans on our panels recently. This was a shock yesterday to see only one." Moreover, even if Gail had made a showing of underrepresentation, we have upheld the selection process for petit jury pools in Hennepin County against constitutional challenge. *See Willis*, 559 N.W.2d at 700; *Roan*, 532 N.W.2d at 569. Gail did not show that these procedures have changed in any material respect since *Willis* and *Roan* were decided.

Because Gail did not make a prima facie showing that his constitutional rights to a representative jury venire were violated, we hold that the district court did not err in denying Gail's motions for a new venire.

Turning to Gail's alternative argument, Gail did not provide either the district court or this court with the legal authority under which the district court was requested to gather information relating to the selection process for Hennepin County petit jury pools. The information Gail sought appears to have been available to him under rule 3, subd. 5(b), and rule 5 of the Rules of Public Access to Records of the Judicial Branch. We hold that the district court did not err when it denied Gail's request that the court gather the information on Gail's behalf.

IV.

■■■■ Gail argues that the evidence was insufficient to convict him of murder in the first degree while committing or attempting to commit the felony crime of unlawful sale of a controlled substance. When reviewing sufficiency of evidence, we inquire whether, "given the facts in the record and any legitimate inferences that can be drawn from those facts, a jury could reasonably find that the defendant was guilty of the charged offense." *State v. Pierson*, 530 N.W.2d 784, 787 (Minn. 1995). We view the evidence in the light most favorable to the verdict. *Id.*

The evidence provides ample support for the conclusion that Gail shot Braziel intending to kill him and that the shooting happened as part of a drug deal. Hollingsworth testified that Braziel came to

Minneapolis to buy $250 worth of cocaine from Gail. While Hollingsworth and Braziel were driving around Minneapolis with Gail, and after Gail received a cell phone call, Gail told Braziel "what the price was going to be"—$250. Gail then directed Braziel to drive to a four-door, red Dodge Neon where two men were waiting. Gail told Braziel to follow the Neon. Gail later told Braziel to get into the Neon, and after some reluctance, Braziel got in the Neon with Gail and the other two men to complete the deal. Hill testified that, after Gail and Braziel got into the car, "they just started to make the deal." Hill testified that Braziel started arguing with Gail that he wanted his money back because the cocaine was "short" and Braziel and Gail started fighting.

Hollingsworth testified that he saw Gail shoot Braziel numerous times after he saw a struggle in the Neon. Hollingsworth's description of Gail's clothing matched the description given by A.L., who saw someone in a "bulky, dark coat" fire multiple shots down toward the ground from outside of the passenger side of the Neon. Finally, the medical examiner testified that Braziel died from multiple gunshot wounds and the manner of death was homicide.

Viewing the evidence in the light most favorable to the verdict, it is clear that there was sufficient evidence to convict Gail of murder in the first degree while committing or attempting to commit the unlawful sale of a controlled substance.

## V.

■■■■ Gail argues that the district court committed reversible error by not providing the jury with an accomplice corroboration instruction for the testimony of both Hollingsworth and Hill. We have held that "trial courts have a duty .to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice." *State v. Strommen,* 648 N.W.2d 681, 689 (Minn.2002). This court evaluates "the erroneous omission of [an accomplice] jury instruction under a harmless error analysis." [9] *State v. Lee,* 683 N.W.2d 309, 316 (Minn.2004).

■■■■ Under Minn.Stat. § 634.04 (2004), a criminal conviction may not be based "upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense." In general, the "test for determining whether a witness is an accomplice for purposes of section 634.04 is whether he could have been indicted and convicted for the crime with which the accused is charged." *Lee,* 683 N.W.2d at 314 (internal quotation marks omitted). When the evidence establishing whether a witness is an accomplice "is disputed or susceptible to different interpretations, then the question whether the witness is an accomplice is one of fact for the jury." *Id.* (internal quotation marks omitted).

9. Generally, this court reviews the failure to provide a sua sponte jury instruction under a plain error standard of review. *E.g., State v. Earl,* 702 N.W.2d 711, 720 (Minn.2005). When this court first applied a harmless error standard for failure to provide an accomplice corroboration instruction, the court appeared to use the harmless error standard because the district court had denied the defendant's motion for the instruction. *See State v. Shoop,* 441 N.W.2d 475, 479–80 (Minn.1989). The defendant in *State v. Lee* did not request an accomplice corroboration instruction. *See* 683 N.W.2d 309, 316 (Minn.2004). The court in *Lee* did not analyze if the standard for omission of a non-requested instruction should be the same as for a denied instruction, and applied the same harmless error standard as used in *Shoop*. *Lee,* 683 N.W.2d at 316. Because we conclude that Gail's challenge would fail under either standard, we apply the harmless error standard employed in *Lee*.

**864**

■ Gail argues that both Hollingsworth and Hill were accomplices to the underlying felony of which the jury found him guilty—sale or attempted sale of a controlled substance—and also accomplices to the intentional murder. Hollingsworth, however, is clearly not an accomplice in the underlying felony. At most, Hollingsworth aided Braziel in the *purchase* of cocaine, not the *sale* of cocaine. Accordingly, Hollingsworth cannot be considered an accomplice even to the underlying felony.[10]

Regarding Hill, we do not decide whether Hill was an accomplice in the murder or that it was error for the district court not to allow the jury to decide the question because we conclude that any error in not submitting the accomplice issue to the jury was harmless on this record.

In *Lee*, we determined that the failure to give the instruction was harmless when an accomplice in the crime of receiving stolen property testified that he stole the property and delivered it to defendant Lee. *Id.* at 312–13, 316. The testimony of the accomplice "was compelled under a grant of use immunity and not done pursuant to a promise of leniency." *Id.* at 316. In finding the omission of the instruction harmless, we indicated that the testimony was "corroborated by other evidence," and that, "[i]n closing argument, the state focused on the evidence corroborating [the accomplice's] testimony, including that of Lee, as well as evidence independently connecting Lee to the offenses." *Id.* at 316–17. Finally, we indicated that "the district court's general instructions on witness credibility alerted the jury to the potential for conflicting motivations behind certain testimony." *Id.* at 317.

In *State v. Shoop*, we pointed to factors similar to those indicated in *Lee* in finding that the refusal to give an accomplice instruction was harmless error. *See State v. Shoop*, 441 N.W.2d 475, 481–82 (Minn. 1989). We also pointed to the state's closing argument statement that the jury did not have "to accept everything that [the accomplice] says at face value" as support that the jury was properly warned about the possible lack of credibility of the accomplice. *Id.* at 481 (internal quotation marks omitted).

■ All of these factors discussed in *Lee* and *Shoop* exist in this case. The state did not give Hill any leniency for testifying against Gail. Hill's testimony on the drug deal was against his own interest, because it tended to establish him as an accomplice in the felony sale of cocaine. Hollingsworth's testimony corroborated Hill's that Gail was an essential part of the drug deal. The state's closing argument only mentioned Hill's testimony to corroborate the testimony of Hollingsworth and A.L. The state's argument regarding Hill constituted approximately two pages of transcript out of more than 30 pages of final arguments. When the state began to talk about Hill, who clearly made the most contradicted statements of all the witnesses, the state said, "you don't have to believe everything someone says." Finally, the district court gave the jury a three-page instruction on "the believability of witnesses."

As the state argues, the central point of having Hill testify was to counter the defense's argument that someone in the Neon shot Braziel.[11] Given the state's cau-

10. We assume, but do not decide, that being an accomplice to the underlying felony would be sufficient to submit the accomplice question to the jury.

11. If Gail had argued that he was innocent because Hill had committed the crime, there would have been no error in failing to give the instruction. *See State v. Swanson*, 707 N.W.2d 645, 653 (Minn.2006) ("A witness who is alleged to have committed the crime

tious treatment of Hill's testimony and the corroboration of his testimony by other evidence, if the failure to provide the instruction was error, "beyond a reasonable doubt the omission did not have a significant impact on the verdict." *Lee*, 683 N.W.2d at 316 (internal quotation marks omitted). We therefore hold that any error in the district court's failure to give the accomplice corroboration instruction was harmless.

## VI.

The jury began deliberating on a Friday and returned its verdict on a Saturday. Once deliberations began and over Gail's objection, the jury was sequestered. Gail raises two issues relating to the jury deliberations. First, Gail argues that Minn. R.Crim. P. 26.03, subd. 5(1) is unconstitutional insofar as it gives the state "veto power" over a decision to allow the jurors to separate after beginning deliberations. Second, Gail argues the district court abused its discretion in not asking the jurors for their preferences as to the timing of the start of deliberations.

■ Turning to the constitutional question, we review de novo the constitutionality of a rule of criminal procedure. *See Ford v. State*, 690 N.W.2d 706, 712 (Minn.2005). Minnesota Rule of Criminal Procedure 26.03, subd. 5(1) provides: "With the consent of the defendant and the prosecution, the court, in its discretion, may allow the jurors to separate over night during deliberation." Gail argues that giving the prosecution the right to consent to the separation of jurors gives the state "the final word" on sequestration. Gail then argues that, because the judiciary has exclusive authority over procedural matters, the rule violates the separation of powers doctrine.

■ There is no merit to Gail's argument. The district court, not the state, has "the final word" on the issue of sequestration. Even where both counsel consent, the rule, through the use of the permissive "may," leaves the sequestration decision vested with the district court. In no way has a separate branch of government been given "the final word" in a procedural matter in this rule. We hold that Minnesota Rule of Criminal Procedure 26.03, subd. 5(1), by permitting the district court to consider separation of a jury only if both the defendant and the state consent to such separation, does not violate the separation of powers doctrine.

■ Turning to the second aspect of Gail's argument, he contends he is entitled to a new trial because the district court did not ask the jurors whether they would prefer to begin deliberations on Friday or on Monday and whether, if deliberations began on Friday, there were concerns with deliberating over the weekend. We review this decision under an abuse of discretion standard. *See State v. Blom*, 682 N.W.2d 578, 607 (Minn.2004). As the district court noted, in denying Gail's motion to inquire of the jurors as to their preferences, "trying to have the jury make a decision about when they would like to deliberate * * * is possibly fraught with real problems." The district court also noted that the trial was being conducted the week before the Thanksgiving holiday, and that during jury selection scheduling issues were discussed. Finally, the district court expressed concern that further questioning of the jurors could be construed as an indication by the court as to how much time the court thought the jurors might need to reach a verdict. We hold that the district court did not abuse its discretion in denying Gail's motion to ask the jurors about their pref-

*instead* of the defendant is, as a matter of law, not an accomplice under section 634.04.'').

erence as to the timing for the commencement of deliberations.

## VII.

Gail argues that the state committed prosecutorial misconduct by improperly shifting the burden of proof, giving a personal opinion, and vouching for a witness.[12] Gail's claims of misconduct are without merit.

■ In claiming that the prosecutor improperly shifted the burden of proof, Gail relies upon the prosecutor's statement in closing argument: "You have to know that the defendant, and the State has to prove beyond a reasonable doubt, that this defendant acted with the intent to kill Mr. Braziel." No rational jury would have heard that statement to indicate that the defendant had to prove anything. This statement was not misconduct.

■ Gail next claims that the state gave a personal opinion when it said:

> [Y]ou might decide that in looking at this that while the defendant had not completed the aggravated robbery or had not completed the drug sale, although I suggest to you that he had done both of those, you may decide he hadn't, and you may decide to look at this as to whether it's an attempt or not.

The state was merely telling the jury that Gail could be found guilty if the jury found that Gail had attempted, rather than completed, the underlying felonies. There was no misconduct by the state in making this statement.

■ Finally, Gail argues that the state's argument that Hollingsworth was "a believable person" and was "frank and sincere" constitutes impermissible vouch-

ing for a witness. Vouching occurs "when the government implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." *State v. Lopez–Rios,* 669 N.W.2d 603, 614 (Minn.2003) (internal quotation marks omitted). "But the state may argue that particular witnesses were or were not credible." *Id.* The state was merely arguing that Hollingsworth was credible, and therefore we hold that the state did not commit misconduct.

Affirmed.

PAGE, Justice (concurring).

I concur with the court's opinion as written except to the extent that it suggests in section II that an individual's expectation of privacy in phone records maintained by a phone company is lessened as a result of caller ID.

---

12. Gail also claims that the state committed misconduct by "disparagement of other party, counsel or theory" and cites all of the state's rebuttal in closing argument as support. Our careful review of the transcript reveals that any misconduct by the state, which we do not find, was cured when the district court allowed Gail to provide a surrebuttal. Thus, there is no merit to this argument.